**Opinion of May 12, 2015 Withdrawn; Affirmed as Modified; and Substitute Opinion filed June 4, 2015.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-13-00509-CV

---

### ENZO INVESTMENTS, LP, Appellant

### V.

### CHARLES WHITE, Appellee

---

### CHARLES WHITE, Cross-Appellant

### V.

### ENZO INVESTMENTS, LP; IP INVESTMENTS, LLC; AND IP REAL ESTATE, LLC, Cross-Appellees

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-08290**

---

## S U B S T I T U T E   O P I N I O N

In this breach-of-contract case, Charles W. "Bill" White alleged that he

presented Enzo Investments, LP with the opportunity to acquire all of the assets of a railcar-cleaning business through a "friendly foreclosure." Enzo and White were to form a new company, which would then operate a similar business. In exchange for brokering the deal, White was to receive a $150,000 commission and 10% of the new company. A jury found that Enzo breached its agreement with White, and assessed damages of over $1.3 million dollars, but the trial court granted Enzo's motion for judgment notwithstanding the verdict on the ground that White's business-valuation evidence used the wrong date, and there was no evidence of the value of White's share of the new company at the time that he should have received it. The trial court reduced the damages to award only the amount of the commission that had not been paid, together with nearly $400,000 in attorney's fees for work performed in the trial court. White contends that the trial court erred in failing to award him the damages assessed by the jury, or alternatively, in failing to grant him equitable relief by ordering specific performance or imposing a constructive trust. Enzo challenges the award of attorney's fees.

White neither introduced legally sufficient business-valuation evidence nor established his right to equitable relief; thus, we affirm those parts of the judgment. Because the evidence regarding White's attorney's fees is legally insufficient to support the full amount awarded for work performed in the trial court, we suggested a remittitur to reduce the award to an amount supported by the evidence. White has timely filed a remittitur. We therefore modify the trial court's judgment to reduce the amount of trial attorney's fees awarded to $209,192.50 and affirm the judgment as modified.

## I. BACKGROUND

Business broker Bill White learned in May 2008 that a railcar-cleaning company known as GalCo was insolvent and in default on a $6 million note held

by Royal Bank.[1] The security for the note included GalCo's assets and real property owned by GalCo's owner Ken Bigham and by Bigham's daughter. In order to avoid foreclosure by the Bank on his family's individual property, Bigham wanted to transfer GalCo's assets through a "friendly foreclosure" with a third party. White prepared a "Distressed Property Investment Proposal" to interest investors in purchasing the business. In the proposal, White stated, "The carrot in the deal is that General Electric has conditionally committed to **a $30M contract** with the company subject to a change in ownership/management and the company making ~$5.1M in capital improvements [short 3-month construction period]."[2] The identity of the distressed company is not stated in the proposal.

## A. Events Before Enzo's Breach

On May 20, 2008, a friend referred White to Enzo Investments, LP as a potential investor. White first met with Enzo's principal Rami Amir, but White would not disclose the identity of the distressed business until Amir signed the "Non-circumvention & business brokerage agreement" that White had prepared. After Amir signed the agreement, White met with Enzo's remaining principals, Ronnie Aliezer and Ohad Yannay, and they decided to proceed with the acquisition. Two days later, White and Enzo signed a second agreement in which they stated that Enzo would have the exclusive right to participate in the venture to acquire GalCo's assets; that GalCo's assets would be transferred to a new company; and that White would receive a $150,000 commission and 10% ownership in the new company.

On May 30, 2008, Enzo and GalCo signed a letter of intent concerning "the

---

[1] GalCo is identified in the record as "Galveston Company, LLC AKA GalCo Environmental Specialists dba GALCO, dba GALCO LLC."

[2] Brackets in original.

3

general terms and conditions upon which a new entity to be formed by ENZO (Purchaser) as agent for the Purchaser is offering to acquire the assets of [GalCo]." They specified that the new entity would "operate an environmental cleaning company similar to GalCo," and that Bigham would receive a substantial consulting fee for obtaining releases from certain of GalCo's creditors. The letter of intent also included a schedule for each step in the acquisition. Under this timeline, the new company would foreclose on GalCo's assets in July or August 2008.

In accordance with its agreement with White, Enzo paid White $2,500 as an advance against his $150,000 commission when the letter of intent was signed; however, the remaining terms of Enzo's agreement with White and its letter of intent with GalCo were not fulfilled. Ten days after signing the letter of intent, Enzo missed the deadline for delivering a contract to GalCo, but the parties continued negotiations for another month. This ended when, in the first half of July, Bigham and White learned that Enzo did not plan to perform a friendly foreclosure, but instead had bypassed them and was negotiating directly with the Bank to buy the note and foreclose.

## B.    Events After Enzo's Breach

Enzo did participate in another entity's acquisition of GalCo's assets, but this was not done through a friendly foreclosure. Enzo's principal Yannay arranged for IP Investments, LLC to purchase the GalCo note from Royal Bank in September 2008. IP Investments is owned by IP Real Estate, LLC, which is wholly owned by Israel Pelta; Pelta is not a party to this action. Enzo's principals also provided all of the money for purchasing the note, but there are no documents requiring the money to be repaid. Yannay admitted at trial that the deal was structured this way because Enzo decided "to go around both Mr. Bigham and Mr.

4

White and try and do this deal directly with the Bank." Angry at being cut out of the deal, Bigham caused GalCo to file for bankruptcy protection. As a result, IP Investments did not foreclose on the property until May or July of 2009.

**C.      White Sues Enzo, IP Investments, and IP Real Estate**

Even before IP Investments foreclosed on GalCo's property, White sued Enzo, alleging that Enzo failed to pay White's entire fee and failed "to tender to White 10% of the ownership of the new entity formed to acquire Galco's assets." By the time the case proceeded to a jury trial, White had amended his petition to add IP Investments and IP Real Estate as defendants. Although White raised a number of additional claims in his pleadings, the only claims that were submitted to the jury were White's claims against Enzo for breach of contract, fraud, and statutory fraud. The jury found Enzo liable under each of the three theories.

The jury was instructed to measure the damages for Enzo's breach of contract as "[t]he difference, if any, between the value of the benefits Enzo Investments, LP promised to provide to Charles W. White under the agreement and the value of the benefits Charles W. White actually received." The jury was told to measure the damages for Enzo's fraud as "[t]he difference, if any, between the value of the benefits that Charles W. White actually received and the value the benefits would have had if they had been as Enzo Investments, LP represented." Both questions contained the same instruction about the time at which the difference in value was to be measured: "The difference in value, if any, of a benefit shall be determined at the time Charles W. White should have received the benefit." In answer to each damage question, the jury assessed damages of $1,324,000. The parties have consistently treated the damages findings as the sum of the damages from Enzo's breach of two contractual obligations: the obligation to pay White a commission of $150,000, and the obligation to convey to White a

5

10% ownership interest in the company acquiring GalCo's assets.

## D.    Challenges to the Evidence of Damages and Attorney's Fees

Enzo moved for judgment notwithstanding the verdict ("JNOV"), arguing that there was no evidence that White was entitled to anything more than $147,500, which was the amount of the unpaid commission. As for White's promised 10% ownership of the new company, Enzo pointed out that White's expert used valuation dates in November 2010. Enzo argued that White used the wrong valuation date, and that there was no evidence of the company's value in 2008. The trial court granted the motion, and awarded White actual damages of $147,500 on his contract claim, together with attorney's fees of $377,567.50 for work performed through the date of trial, and $20,625.00 for post-verdict work, for a total of $398,192.50. The trial court also made contingent awards of attorney's fees in the event that White was the prevailing party on appeal.

Enzo filed a post-judgment motion in which it challenged the award of attorney's fees and asked the trial court to order a new trial of the issue, to modify the judgment, or to suggest a remittitur. The trial court denied the motion, and Enzo brought this appeal.

White similarly filed a motion in which he asked the trial court to reconsider the JNOV, or in the alternative, to modify the judgment to either (1) order specific performance of Enzo's obligation to convey 10% of IP Investments to him, or (2) impose a constructive trust in White's favor on an undivided 10% interest in the IP entities' assets. The trial court denied this motion as well, and White filed this cross-appeal.[3]

_____

[3] In response to our inquiry as to whether the IP entities intended to file a brief in response to cross-appellant White's brief, the IP entities stated that there was no need for them to do so because White did not appeal the take-nothing judgment against them, and thus, we lacked

6

## II. WHITE'S CHALLENGE TO THE JNOV

In his first issue, White contends that the trial court erred in granting Enzo's JNOV motion regarding damages. We review a JNOV under the legal-sufficiency standard, crediting evidence supporting the verdict if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the challenged verdict. *See id.* at 827.

We measure the sufficiency of the evidence against the relevant part of the jury charge, where, as here, there has been no objection to it. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005). Here, the jury was instructed to measure the damages for Enzo's breach of contract as the difference between the value of the benefits Enzo promised to provide to White under the agreement and the value of the benefits White actually received, measured as of the time that White should have received the benefit.

Some parts of this calculation are simple. Regarding the commission, the equation is straightforward: it is undisputed that Enzo promised to pay White $150,000, but only paid him $2,500, and that the difference between these two values is $147,000. This component of the damages award is not contested on

---

jurisdiction over them. This is incorrect. White's appeal of the final judgment confers jurisdiction on this court over all of the parties to the judgment. *See* TEX. R. APP. P. 25.1(b) ("The filing of a notice of appeal by any party invokes the appellate court's jurisdiction over all parties to the trial court's judgment or order appealed from."). The IP entities are parties to the judgment and they are adverse to White; thus, they are, by definition, appellees. *See* TEX. R. APP. P. 3.1(c). Despite the IP entities' statement that they would not file a brief, they addressed the merits of White's cross-appeal in their response to our inquiry, and additionally appear to have adopted Enzo's cross-appellee's brief. We accordingly treat the IP entities' response to our inquiry as their own cross-appellees' brief, and treat Enzo's cross-appellee's brief as a brief on behalf of all of the defendants.

appeal, and we do not address it further.

Regarding any other component of damages, one part of the equation also is undisputed: because White received nothing else from Enzo, the value of the benefit he received is zero. Thus, after assessing damages for the unpaid commission, the jury had to determine three things: (a) what other benefits did Enzo promise to provide to White under the agreement, (b) when should White have received that benefit, and (c) what was the value of the benefit at the time White should have received it. We address each in turn.

## A. Enzo promised to provide White a 10% ownership interest in the new company that would acquire GalCo's assets and operate a similar business.

The only agreements executed both by White and by Enzo or one of its principals are the "Non-circumvention & business brokerage agreement" of May 20, 2008 and the "Agreement" of May 22, 2008; we will refer to these as "the First Agreement" and "the Second Agreement."

The First Agreement provided as follows:

> Rami Amir hereby acknowledges receipt of the *Safe-Clean Industrial* business acquisition proposal from Charles W. White and agrees to coordinate all efforts to obtain an ownership interest in the underlying distressed business through White . . . . The name and address of the distressed business slated for acquisition will be identified in Exhibit A which will be attached hereto and made a part hereof for all purposed [sic] upon execution of this agreement by both parties.
>
> . . . .
>
> Exhibit A
>
> The friendly foreclosure acquisition company is GalCo . . . .

Other documents prepared by White show that "Safe-Clean Industrial" was the name he frequently used to refer to the unnamed corporation that he expected would be formed to hold GalCo's assets. Although there is no document titled

8

"*Safe-Clean Industrial* business acquisition proposal," it is undisputed that the document referred to is the "Distressed Property Investment Proposal" prepared by White for potential investors. In that proposal, White stated that he was "putting together a short-fuse investment deal to acquire a distressed industrial business." He further stated, "The carrot in the deal is that General Electric has conditionally committed to a **$30M contract** with the company subject to a change in ownership/management and the company making ~$5.1M in capital improvements [short 3-month construction period]."[4]

> [White] is arranging for investor capital in order to acquire [GalCo]. GalCo's assets will be transferred to a new corporation to be named that will be formed to operate the business. The new company will operate an environmental cleaning company similar to GalCo.
>
> . . . .
>
> White to receive 10% ownership in Safe-Clean Industrial in the form of Common Stock . . . . No dividends or other distributions shall be payable to the common stockholder until the preferred shareholder has first received complete repayment of its equity capital contribution.[5]

The Second Agreement provided as follows:

Thus, Enzo promised that White would "coordinate all efforts to obtain an ownership interest" in the "friendly foreclosure acquisition company" known as GalCo. In return, Enzo would provide to White 10% of the ownership of a new company that would own GalCo's assets and operate a similar business.

On appeal, White asserts that "the contract also contemplated" that (1) Enzo would invest $5.1 million to make improvements to the facility that would be necessary to obtain General Electric's business; and (2) White would manage the

---

[4] Brackets in original.

[5] White also was to have 10% of the ownership of "other G.E. Environmental projects to follow," together with an option to purchase an additional 5% of "each following project." Because there were no such projects, we do not consider this provision further.

new company "during that re-development process," which was expected to take about two years. But not everything that was contemplated was promised. Regarding the extent of Enzo's future investment, White cites evidence that the parties knew that General Electric would consider contracting with the new company if the new company made certain capital improvements, but this is not evidence that Enzo promised White that it would fund the improvements. As for White's management of the new company, it is undisputed that White drafted a contract that included the provision, "White will be *a preferred candidate* for the position of CEO / Operations Manager for [the new company] during the initial 2-3 years of operations." (emphasis added). Enzo, however, required that provision to be removed. It does not appear in the contract with White that Enzo actually signed, and we cannot rewrite the parties' contract to insert provisions that they could have included. *Hernandez v. Abraham, Watkins, Nichols, Sorrels & Friend*, 451 S.W.3d 58, 72 (Tex. App.—Houston [14th Dist.] 2014, pet. filed).

In the language of the jury charge, and leaving aside the commission, the only "benefit" that Enzo "promised to provide to [White] under the agreement" was a 10% ownership interest in the new company that acquired GalCo's assets and operated a similar business. But, before we turn to the valuation evidence, we must examine the evidence about when White "should have received" the ownership interest if Enzo had complied with the agreement. Only then will we know when the promised benefit's value must be measured.

**B.     There is no evidence that if Enzo had complied with its agreement, then the date on which White should have received a 10% ownership interest in the new company was later than September 2008.**

To determine when White "should have received" the ownership interest in the new company, we look to the evidence to see when GalCo's assets would have been transferred to the new company if Enzo had not breached the contract.

10

Before Enzo breached the contract, Enzo and GalCo signed a letter of intent concerning "the general terms and conditions upon which a new entity to be formed by ENZO (Purchaser) as agent for the Purchaser is offering to acquire the assets of [GalCo]." The letter of intent included the following schedule for the acquisition:

1. Enzo and GalCo were to execute the letter of intent by May 30, 2008.

2. Within ten days after executing the letter of intent, i.e., by June 9, 2008, Enzo was to deliver a purchase contract to GalCo.

3. Within three business days after the purchase contract was delivered, i.e., by June 12, 2008, the parties were to execute the purchase contract.

4. Not later than forty-five days after the effective date of the purchase contract, i.e., by July 27, 2008, Enzo or the new company was to purchase the note from Royal Bank. The parties referred to this event as "Preclosing." Upon Preclosing, Bigham was to turn GalCo's operations over to Enzo or the new company.

5. Enzo or the new company would then schedule the foreclosure for the first available constable's sales date after the purchase of the note, and the new company would purchase GalCo's assets at the foreclosure sale. The parties referred to this as "Closing."

6. The parties agreed that Enzo would "make every effort to Preclose and Close as soon as possible."

In most instances, the parties to the letter of intent do not identify which acts were to be performed by Enzo and which were to be performed by the new company that would act as its agent, but in any event, the letter of intent provided that before

11

the foreclosure, Enzo's interests in the agreement would be conveyed to the entity of Enzo's choice. Thus, if Enzo had adhered to the schedule in the letter of intent, the new company would have acquired GalCo's assets and operations by the end of July or August 2008.

But there were delays, some of which ostensibly were associated with attempts to obtain a commitment to a future contract between the new company and General Electric. The letter of intent contained the following provisions related to General Electric:

1. "Upon signing this Letter of Intent, [GalCo] will immediately introduce [Enzo] to Royal Bank, GE Rail Services, and all existing GalCo customers and facilitate contract talks with the new owner."

2. The "Assets to be conveyed" were defined to include "assistance in securing a completed contract with General Electric, [and] assistance in securing General Electric's agreement and concurrence of construction commencement date for development of the rail yard and related car inspection/cleaning buildings."

3. "[Enzo] will provide Bank letters to appropriate parties confirming [its] ability to fund required capital for (a) purchase funds, (b) Royal Bank payoff, and (c) G.E. improvements."

4. "GE contract: Should [Enzo] determine that GE is unwilling to commit to a contract acceptable to [Enzo], [Enzo] shall have the right to withdraw from the purchase."

General Electric, however, was unwilling to begin contract talks until after the foreclosure. By July 10, 2008, White had asked General Electric at least seven times to sign a letter of intent, but General Electric did not do so.

12

One month after the contract between Enzo and GalCo was to have been executed, their contract negotiations still were ongoing. As late as July 11, 2008, White emailed General Electric, "I have been assured that the GalCo sale will go through and will continue to do everything within my power to make that come to pass sooner instead of later." If GalCo and Enzo had executed a contract in accordance with the letter of intent at that time, then the foreclosure date would have been pushed back by a month, to August or September 2008. If GalCo and Enzo had executed a purchase contract containing terms that were not in accordance with the letter of intent, then the terms of the purchase contract would have prevailed to the extent of any conflict. By July 16, 2008, however, White had been informed that Enzo was no longer negotiating with Bigham to acquire GalCo's assets, and White's agreement with Enzo was terminated. Consequently, the parties never agreed to a date later than September 2008 for the new company to acquire GalCo's assets and operations.

On appeal, White admits that "it is reasonable to infer that if Enzo had dealt forthrightly with GalCo, it would have acquired GalCo's assets through the friendly foreclosure process in late July or August 2008." White argues, however, that the jury reasonably could have determined that it would be two additional years before White would have "received the benefits Enzo promised him," because he contends that the promised benefits included (1) Enzo's investment of $5.1 in capital improvements, and (2) White's management of the company for two years. As previously discussed, however, these were not benefits that Enzo promised to provide to White under their agreement.

These premises also fail to support an inference that the date on which White "should have received" the benefit that Enzo promised to provide him did not arrive until late 2010—more than two years after the new company should have

13

acquired GalCo's assets and begun operating a similar business. For example, even if White's agreement with Enzo had incorporated the references in White's business proposal to the improvements needed to secure General Electric's business, the proposed improvements were to have been made within three months. Thus, even if the foreclosure on GalCo's assets had been delayed until September 2008, the improvements should have been completed in December 2008, not in November 2010. As for White's assertions about managing the new company, even in the rejected draft agreement, White's compensation for managing the company would have been a salary, not a percentage of the company. White does not contend on appeal that the damages assessed by the jury include a salary that he would have received for managing the company; he argues only that such a provision affects the time at which the value of the company should be determined. The jury, however, was instructed to measure the value of the promised benefit at the time that White should have received it, and White does not contend that the agreement permitted Enzo to refuse to convey an ownership interest in the new company to him until after he had finished managing the company for two years. To the contrary, White maintained both at trial and on appeal that the new company was to be "formed" by Enzo and White, and at trial, he denied that his promised 10% ownership interest "cover[ed] anything besides Enzo's acquisition of the GalCo business and assets."

White also identifies various times when Enzo "could still have fully complied with the Agreement," but we must measure the sufficiency of the evidence in accordance with the jury charge. Given the instructions in the charge, we must determine whether there is legally sufficient evidence of the value of a 10% interest in the new company measured at the time when White "should have received" it if Enzo had complied with the agreement, not the ownership interest's

14

value at a later time when, despite the delays caused by Enzo's breach of the agreement, Enzo "could still have" conveyed the ownership interest.

In sum, the jury could have concluded that White should have received a 10% interest in the new company as early as June 2008 or as late as September 2008, but in the language of the charge, there is no evidence that the date on which White "should have received the benefit" that Enzo "promised to provide" to him under the agreement was later than September 2008.

**C.     There is no evidence of the value of the promised ownership interest in the new company at the time White should have received it.**

Although the jury was required to determine the value of the benefit that Enzo promised to provide to White under the agreement, determined as of the time that White should have received it, White introduced evidence of the value of "the benefit's benefits," that is, the benefits he would have received in 2010 if he had owned 10% of the new company at that time. As White's expert phrased it, "In 2010 we are seeing the results of the investors having equity."

To see why this is the answer to the wrong question, let us look at White's damage model and the events on which it is based. After the breach, Enzo's principals funded IP Investments' purchase of the note held by Royal Bank and secured by GalCo's assets. Bigham reacted to this by causing GalCo to file for bankruptcy protection, thereby delaying the foreclosure until the summer of 2009. From September 2008 onwards, Enzo's principals helped IP Investments acquire GalCo's assets and run its operations by "loaning" money to the IP entities, paying expenses on the companies' behalf, or funding improvements to the real property formerly owned by GalCo. White's valuation expert Jeffery Compton opined that all of these monies were really capital contributions in IP Investment. Then, on November 16, 2010, Enzo's principals signed documents for a loan of

15

approximately $8 million. After paying closing costs, prepaying interest, and putting a small fraction of the money into IP Investments, $7.35 million of the $8 million loan was paid to Enzo's principals. Compton characterized this payment as a return of capital to the investors, and he reasoned that if White had owned 10% of IP Investments at that time, then 10% of that amount would have been distributed to him. Compton therefore concluded that in November 2010, the value of the benefit that White would have received from his ownership interest was $735,000.

This was only one component of the damages White sought. Compton next testified about the amount of equity that would have remained in IP Investments after this return of capital. According to an appraisal performed in connection with the $8 million loan, IP Investments' real property had a value of approximately $11.2 million on November 1, 2010. To this figure, Compton added the value of other assets that IP Investments owned in November 2010, and calculated that IP Investments' total value at that time was approximately $11.7 million. From this figure, Compton subtracted the $7.35 million payment to Enzo's principals, and concluded that after the return of capital, there was still $4.39 million in equity in the company. According to Compton, if White had owned 10% of the company at that time, then the value of his ownership interest after the return of capital was $439,000.

White accordingly argued to the jury that the value of the benefit Enzo "promised to provide to [White] under the agreement," measured at the time that White should have received it, was the sum of (a) a $735,000 payment for "return of capital," (b) $439,000 in "residual equity, and (c) the $150,000 commission—a

16

total of $1,324,000. This is exactly the amount that the jury assessed.[6]

In its agreement with White, however, Enzo did not "promise to provide" White a return of capital, a distribution, or residual equity in 2010. Enzo did not even promise that the company still would be in existence in 2010. The only things that Enzo promised that White would receive were his commission and a 10% ownership interest in the company that acquired GalCo's assets and operated a similar business.

White should have received the ownership interest when the new company foreclosed on GalCo's assets. Before that time, the new company was first an empty shell that owned nothing, and then, when it acquired the note from the Bank, it was a company that owned a GalCo liability, not a GalCo asset. The value of White's ownership interest was not be measured at these times, because he was not promised an ownership interest in an empty shell or in a company that owned a GalCo liability. But once the new company acquired an ownership interest in GalCo's assets, nothing in Enzo's agreement with White authorized Enzo to delay performance of its contractual obligation to convey 10% of the company to White.

If Enzo had complied with its agreement with White, then the new company would have acquired GalCo's assets and operations through a friendly foreclosure sometime between June 2008 (if Enzo had been able to expedite matters in accordance with its stated intent to "make every effort to Preclose and Close as soon as possible") and September 2008. There is no evidence that, absent Enzo's breach, the new company would have acquired GalCo's assets any later than September 2008. Thus, under the agreement, the value of White's promised

---

[6] The damages question associated with the fraud findings similarly required the value of a benefit to be measured at the time that White should have received it. White's attorney stated, "I am just going to tell you it is the same elements. It is the exact same element[s] and it [sic] the same calculation."

17

ownership interest at the time he *should* have received it was the value of a 10% interest in the new company sometime between June 2008 and September 2008.

In post-judgment motions and on appeal, White argued that the real estate appraisal performed on November 1, 2010 supports an inference of some amount of damages from Enzo's failure to convey an ownership interest in the new company to him. He pointed out that the appraiser testified that the real property would have been appraised at the same value for the preceding eighteen months, minus the amounts that were expended for capital improvements during that time. White accordingly reasoned that the jury could have taken the appraised value of the real estate on November 1, 2010; subtracted the amounts expended for capital improvements during the preceding eighteen months to arrive at the value of IP Investments' real estate in May 2009; and inferred that the value of White's 10% interest in the new company would have been 10% of that figure. We express no opinion about whether this method would have supported an inference about the value of White's promised 10% interest in the new company in May 2009, because as previously discussed, there is no evidence that White should have received the ownership interest later than September 2008.

We conclude that the trial court did not err in granting judgment notwithstanding the verdict. We therefore overrule this issue.

### III. WHITE'S CHALLENGE TO THE DENIAL OF EQUITABLE RELIEF

In his second issue, White argues that if the evidence is legally insufficient to support an award of monetary damages for the value of his promised ownership interest in the new company, then the trial court erred in refusing White's requests for the alternative remedies of specific performance or imposition of a constructive trust on 10% of the IP entities' assets. White made these requests to the trial court in his motion to modify the judgment, and we review the trial court's ruling for

18

abuse of discretion. *See Kamat v. Prakash*, 420 S.W.3d 890, 905 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (applying the abuse-of-discretion standard when reviewing the trial court's ruling on a motion to modify); *see also Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007) (per curiam) (reviewing the imposition of a constructive trust under the abuse-of-discretion standard); *Chevron Phillips Chem. Co. LP v. Kingwood Crossroads, L.P.*, 346 S.W.3d 37, 61 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (applying the same standard when reviewing a trial court's ruling on a request for specific performance). For several reasons, we conclude that the trial court did not abuse its discretion by refusing to order specific performance or to impose a constructive trust.

As the trial court explained at the hearing on White's motion to modify the judgment, ordering specific performance or imposing a constructive trust would "be doing exactly what the [Texas Supreme] Court said you can't do" in *Miga v. Jensen*. 96 S.W.3d 207 (Tex. 2002). *Miga* concerned the breach of a stock-option agreement, for which the plaintiff erroneously sought to recover the stock's value as of the time of trial, rather than at the time of breach. *Id.* at 213. The court explained the importance of using the correct valuation date:

> All assets, whether property or cash, fluctuate in value over time. But the proper way to make [the plaintiff] whole is not by allowing him to recover the market gain he would have reaped had he received his stock as promised . . . . The proper way to compensate [the plaintiff] for his lost investment opportunity is through the award of interest . . . .

*Id.* at 217. As the trial court indicated here, to give White a legal or equitable interest in the company at the time of trial would be to give him more than he had bargained for: gain without risk. Instead of receiving an interest in a distressed company, he would reap its benefits years later, after others had invested in capital improvements and paid the company's expenses.

19

The reasoning in *Miga* applies both to White's request for specific performance and to his request for a constructive trust. There are, however, additional reasons to conclude that the trial court did not abuse its discretion in denying each of the equitable remedies sought.

**A.    The trial court did not abuse its discretion in denying White's request for specific performance.**

In seeking specific performance, White asked the trial court to order the conveyance of 10% of the membership interest in "IP" to him, and he analogized the membership interests in the IP limited liability companies to stock in a closely-held corporation. Courts generally will not order specific enforcement of a contract concerning personal property unless a remedy at law is inadequate. *See Am. Apparel Prods., Inc. v. Brabs, Inc.*, 880 S.W.2d 267, 269 (Tex. App.—Houston [14th Dist.] 1994, no writ). But if a closely-held corporation's stock has no ascertainable market value, a party may seek specific performance to enforce a stock-purchase agreement. *See Miga*, 96 S.W.3d at 217 & n.55 (citing *Bendalin v. Delgado*, 406 S.W.2d 897 (Tex. 1966)).

White asserts that his valuation expert Jeffery Compton "presented the only possible means of valuing White's 10% interest in IP," and reasons that if this constituted "no evidence," then this is a case in which "a closely-held corporation's stock has no ascertainable value." But, both the premise and the reasoning are flawed. Money damages were available and ascertainable; White simply failed to introduce legally sufficient evidence of the value of White's promised 10% interest in the new company as of the correct time. Compton testified that he used a valuation date of November 15, 2010 because that was the date White's attorney wanted Compton to use, and that White's attorney could have picked any valuation date. As to whether the market value of White's promised interest in the new company was ascertainable, Compton explained that he did not address the

20

marketability of White's promised share of the company because he was not testifying about a "conclusion" of value, but instead was testifying about a "calculation" of value. He explained that this approach did not require him to take the marketability of a limited share of the company into account, because he instead calculated the value of "the entire entity," and "[a]s to marketability[,] when you are looking at the entire entity[,] in particular when it has real estate like this[,] selling real estate usually can occur in a really short period of time . . . ."

Thus, the record shows that White chose to present a calculation of the value of IP Investment *as a whole* in November 2010. From this evidence, it is not possible to infer that White's promised 10% interest in the new company would have had no ascertainable value in the period from June 2008 to September 2008.

**B.    The trial court did not abuse its discretion in denying White's request for a constructive trust.**

In connection with his request for a constructive trust, White relies on the Texas Supreme Court's statement that a constructive trust is available "wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrong-doer." *Fitz-Gerald v. Hull*, 150 Tex. 39, 51, 237 S.W.2d 256, 263 (1951). But to say that a remedy may be available is not to say that it is required. There are limits. *See KCM Fin. LLC v. Bradshaw*, No. 13-0199, 2015 WL 1029652, at *13 (Tex. Mar. 6, 2015). "A constructive trust is not merely a vehicle for collecting assets as a form of damages." *Id.*, 2015 WL 1029652, at *14. And here, a constructive trust is not "necessary for the obtaining of complete justice." As in *Miga*, the way to make White whole was through monetary damages and interest, and these were available to him at trial. Equity does not require the imposition of a constructive trust simply because White failed to meet his burden of proof of monetary damages. To hold otherwise would be to place White in a better position than he would have occupied if he had met his

21

burden of proof.

This is not the only problem. As the Texas Supreme Court recently stated, "Definitive, designated property, wrongfully withheld from another, is the very heart and soul of the constructive trust theory." *Id.*, 2015 WL 1029652, at \*13 (quoting *Wheeler v. Blacklands Prod. Credit Ass'n*, 627 S.W.2d 846, 851 (Tex. App.—Fort Worth 1982, no writ)). But in his motion to modify, White stated that he sought a constructive trust over the assets of "IP," without specifying whether he was referring to IP Real Estate, IP Investments, or both. It makes a difference. IP Real Estate's only asset is its ownership of 100% of the membership interests in the limited liability company, IP Investments. A member in a limited liability company does not have an interest in any specific property owned by the company. TEX. BUS. ORGS. CODE ANN. § 101.106(b) (West 2015). In contrast, IP Investments' assets include all of the property it owns, whether tangible or intangible, real or personal. An interest in IP Investments' assets is an interest in the company's property. Given the ambiguity in the relief that White requested in his motion to modify, we cannot conclude that the trial court abused its discretion in refusing to impose a constructive trust.

We overrule this issue.

## IV. ENZO'S CHALLENGE TO THE AWARD OF ATTORNEY'S FEES

In its own appeal, Enzo challenges the award of attorney's fees on the grounds that (a) the evidence is legally insufficient to support the amount of fees awarded, (b) the amount awarded is excessive, and (c) the prevailing party in a contract action is not statutorily authorized to recover attorney's fees from a limited partnership. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2015). We generally address first those issues that could require rendition of judgment. *See* TEX. R. APP. P. 43.3. Because only Enzo's third issue, if

22

successful, would require us to render a take-nothing judgment on the issue of attorney's fees, we begin with that issue.

**A.    Enzo failed to preserve the complaint that the statute does not authorize recovery of attorney's fees from a limited partnership.**

White sought recovery of attorney's fees under Texas Civil Practice and Remedies Code section 38.001(8), which provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8). On appeal, Enzo argues that this statute does not authorize a person to recover attorney's fees against a partnership. *See Fleming & Assocs., LLP v. Barton*, 425 S.W.3d 560, 576 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Enzo admits, however, that it did not raise this argument in the trial court. *See* TEX. R. APP. P. 33.1(a).

We have held that a party wishing to argue on appeal that a statute does not authorize an award of attorney's fees must preserve its complaint in the trial court. *See Office of Attorney Gen. v. Phillips*, No. 14-03-01040-CV, 2004 WL 2559934, at *2 n.1 (Tex. App.—Houston [14th Dist.] Nov. 12, 2004, no pet.) (supp. mem. op. on reh'g). Although Enzo argues that it can raise the complaint for the first time on appeal because the issue is either an instance of fundamental error or is jurisdictional, it cites no authorities that have so held. There is authority, however, for the contrary proposition. *See City of Port Isabel v. Shiba*, 976 S.W.2d 856, 860–61 (Tex. App.—Corpus Christi 1998, pet. denied) (holding that a complaint that section 38.001 does not authorize an award of attorney's fees against a defendant is neither fundamental error nor jurisdictional, and thus, must be preserved in the trial court by a timely request, objection, or motion).

We agree with the reasoning of the Thirteenth Court of Appeals in *Shiba* that

23

this is neither a complaint of fundamental error nor a jurisdictional matter, and we continue to follow our own precedent that the complaint must be preserved in the trial court. We overrule this issue.

## B.    The evidence is legally insufficient to support the amount awarded.

Enzo also argues that, for two reasons, the evidence is legally insufficient to support the award of attorney's fees for work performed in the trial court.[7] First, he asserts that White failed to segregate fees for work performed to advance claims for which fees are recoverable from fees for work performed solely in connection with claims for which no such award is available. Second, he contends that attorney Perry Zivley Jr.'s affidavit lacks the specificity that is required when, as here, a party uses the lodestar method to establish the reasonableness and necessity of the attorney's fees he seeks.

### 1.    Attorneys Carrigan and Walker sufficiently segregated recoverable from non-recoverable fees; attorney Zivley did not.

If any attorney's fees relate solely to a claim for which such fees are unrecoverable, the party seeking an award of attorney's fees must segregate recoverable from unrecoverable fees. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). According to Enzo, we must reverse the trial court's fee award because "White made no attempt to segregate its attorney's fees other than to make an arbitrary statement that approximately 95% of counsels' time was

---

[7] Enzo did not explicitly exclude the award of appellate attorney's fees from this challenge, but in its statement of the case, Enzo wrote that the trial court's judgment included "$398,192.50 in attorneys' fees," which is the sum of the amounts awarded by the trial court for "attorneys' fees through the date of trial" and "for post-verdict matters in the trial court." In its statement of facts and in its argument, Enzo similarly referred to "approximately $390,000 in legal fees." This amount necessarily excludes the trial court's contingent awards of $41,250 if White is the prevailing party in the intermediate court of appeals, and $68,750 if White is the prevailing party in an appeal to the Texas Supreme Court. We therefore conclude that Enzo did not challenge the contingent awards of appellate attorney's fees.

devoted to pursuing claims for which fees are recoverable."

Enzo is partially correct. White's evidence of attorney's fees consisted of the affidavit testimony of Mark Carrigan, Darrin Walker, and Perry Zivley Jr., but Carrigan and Walker adequately segregated the fees associated with White's breach-of-contract claim against Enzo from fees attributable solely to other defendants or claims.[8] Carrigan stated the number of hours spent in performing various tasks to advance White's breach-of-contract claim against Enzo, and he attested that he omitted from his affidavit any work he performed solely to advance a different claim. For each task included in Walker's fee affidavit, Walker identified the percentage of time that was attributable to White's breach-of-contract claim against Enzo. This is sufficient segregation. *See id.* at 314 ("[A]n opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim.").

Zivley, however, stated, "In my opinion, 95% of my attorney time in this case was attributable to the prosecution of Plaintiff's breach of contract claims against Defendants and/or the response to Defendants' counterclaims and affirmative defenses to Plaintiff's breach of contract claim." Although White prevailed in a breach-of-contract claim only against Enzo, Zivley failed to segregate fees associated with that claim from fees related to contract claims against IP Investments or IP Real Estate. Zivley also does not identify the counterclaims to which he refers. It is impossible to tell how much of Zivley's work was necessary to the successful prosecution of White's breach-of-contract claim against Enzo. Thus, Zivley failed to adequately segregate recoverable from

---

[8] Because Zivley is the only attorney mentioned in this section of Enzo's brief, it is not clear whether Enzo contends that all three attorneys failed to adequately segregate recoverable from non-recoverable fees. Because Enzo does not expressly state that this argument is intended to apply only to Zivley's affidavit, we have examined each of White's three attorney affidavits for evidence of adequate segregation.

25

non-recoverable fees.

### 2. Zivley's affidavit lacks the specificity required to prove attorney's fees using the lodestar method.

To assess a reasonable amount for attorney's fees using the lodestar method, the factfinder "must determine the reasonable hours spent by counsel in the case and a reasonable hourly rate for such work." *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). The product of those two numbers is the "lodestar." *Id.* If necessary, a multiplier may be applied to the lodestar to adjust it up or down in order to reach a fee that is reasonable under the circumstances. *Id.* A party who chooses to use the lodestar method to establish the amount of his reasonable and necessary attorney's fees "must provide evidence of the time expended on specific tasks to enable the fact finder to meaningfully review the fee application." *Long v. Griffin*, 442 S.W.3d 253, 253 (Tex. 2014) (per curiam).

Here, White chose to use the lodestar method to establish the amount of reasonable and necessary attorney's fees attributable to the successful prosecution of his breach-of-contract claim against Enzo; thus, he was required to provide evidence of the time expended on specific tasks. Enzo concedes that Carrigan and Walker "arguably provided enough detail to support the work done and time spent on each task," but contends that Zivley's affidavit is insufficiently specific because he only lists general categories of work without stating the amount of time spent on specific tasks. We agree.

Zivley attested that he spent a total of 280 hours prosecuting White's breach-of-contract claims against Enzo, IP Investments, and IP Real Estate; in defending against their counterclaims; and in overcoming their affirmative defenses. His description of the work he performed is as follows:

The specific work I performed in this case includes, but is not limited

26

to, the following:

a. Reviewed pleadings of the parties.

b. Drafted, revised and reviewed Plaintiff's pleadings.

c. Reviewed, drafted and revised discovery to Defendants and discovery responses (including thousands of pages of documents produced).

d. Prepared for, attended and/or reviewed depositions taken in this case.

e. Attended hearings before the court.

f. Prepared, reviewed and revised responses to multiple Motions for Summary Judgment filed by Defendants.

g. Numerous meetings with Plaintiff throughout all stages of the litigation, in preparation for trial testimony and throughout trial.

h. Attended numerous meetings and strategy sessions with co-counsel in preparation for trial.

i. Researched legal issues relating to the prosecution of the case.

j. Prepared trial and demonstrative exhibits presented in the case.

k. Prepared for and attended mediation.

l. Attended and directly participated in the trial of this case through direct and cross-examination of witnesses.

m. Participated in the development and review of the court's charge.

From this information, it is impossible to evaluate the extent to which Zivley's work was reasonable and necessary to the prosecution of White's breach-of-contract claim against Enzo.[9]

---

[9] The total fees awarded also cannot be sustained based on a contingency-fee arrangement. *See Long*, 442 S.W.3d at 256 (determining whether a fee award that could not be sustained under the lodestar method could be sustained as a contingency fee). Zivley attested that he represented White on a contingent-fee basis, and although he stated that 40% of the gross recovery would be a reasonable contingent fee, he did not state that this is what their agreement provided. Of the remaining two attorneys, Mark Carrigan also stated that he worked on a contingent-fee basis, but he neither stated its terms nor identified any particular percentage as reasonable, but instead introduced evidence that his reasonable and necessary fees exceeded the

White does not dispute that Zivley's affidavit lacks the specificity required under the lodestar method. White instead contends that Enzo failed to preserve its legal-insufficiency complaint in the trial court. He argues in the alternative that we cannot address the merits of the complaint, but must overrule it because Enzo failed to request the appropriate relief. We disagree with both assertions.

In support of the contention that Enzo failed to preserve his legal-insufficiency complaint in the trial court, White cites the general rule of error preservation set forth in Texas Rule of Appellate Procedure 33.1(a) (providing that to preserve a complaint for appeal, a party must present the complaint to the trial court through a timely request, objection, or motion, and must either obtain an express or implicit ruling from the trial court or must object to the trial court's failure to rule). But when an issue is tried without a jury, a complaint that the evidence is legally or factually insufficient to support the trial court's finding on the issue is not required to be raised in the trial court, but instead can be raised for the first time on appeal. *See* TEX. R. APP. P. 33.1(d). By agreement of the parties, the issue of attorney's fees was decided by the trial court based on affidavits; thus, Enzo was not required to preserve this complaint in the trial court.

In his alternative argument, White points out that in the prayer for relief in Enzo's brief, Enzo asked us to render judgment denying White any award of attorney's fees, even though that is not the appropriate remedy. *See United Nat'l Ins. Co. v. AMJ Invs., LLC*, 447 S.W.3d 1, 17–18 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd by agr.). We disagree, however, with White's conclusion that we are foreclosed from reversing the fee award and awarding less relief than Enzo requested. *See* TEX. R. APP. P. 43.3(a) ("When reversing a trial court's

damages awarded to White in the judgment. The third attorney, Darrin Walker, attested that he is paid a fixed fee of an unstated amount by the other attorneys.

judgment, the court must render the judgment that the trial court should have rendered, except when . . . a remand is necessary for further proceedings . . . ."); *Advanced Pers. Care, LLC v. Churchill*, 437 S.W.3d 41, 49 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Although the Buyer has requested rendition rather than remand, remand is the relief to which it is entitled. We therefore reverse the trial court's judgment and remand the case." (citations omitted)); *compare Stevens v. Nat'l Educ. Ctrs., Inc.*, 11 S.W.3d 185, 186 (Tex. 2000) (per curiam) (denying review where the petitioner raised a complaint for which remand would have been the appropriate remedy, but the petitioner "specifically requested that this Court not remand for a new trial") *with Garza v. Cantu*, 431 S.W.3d 96, 108–10 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (sub. op.) (remanding for a new trial where remand was the appropriate remedy, because although the appellant asked only for rendition, it "did not adopt a 'rendition-or-bust' strategy").

But this brings us to the question: what *is* the correct disposition of the challenge to the award of attorney's fees, given that the affidavits of both Carrigan and Walker are legally sufficient?

When the evidence is sufficient to support some of the amount awarded, the Texas Supreme Court at some times has remanded the case to the intermediate appellate court to consider suggesting remittitur; at other times, it has remanded the case to the trial court for a new trial. *See Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007) (citing *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 310 (remanding to the court of appeals to consider suggesting remittitur) and *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 739–40 (Tex. 1997) (remanding to the trial court for a new trial)).[10] And, where the intermediate appellate court has both

---

[10] Although *Guevara* dealt with medical expenses, the Texas Supreme Court cited *Tony Gullo Motors I, L.P.*, in which the court analogized an award of attorney's fees to awards of medical expenses. *See Guevara*, 247 S.W.3d at 669–70 (citing *Tony Gullo Motors I, L.P.*, 212

suggested a remittitur of the total fee award and treated the reduced amount as the sum of separate awards to each of three attorneys, the Texas Supreme Court has followed the same approach, affirming the appellate court's decision as to one attorney, and reversing and remanding the question of another attorney's reasonable and necessary fees to the trial court. *See City of Laredo v. Montano*, 414 S.W.3d 731, 737 (Tex. 2013) (per curiam).

Here, the evidence is legally sufficient to support a total fee award of $209,192.50, which is the sum of the specific dollar amounts requested in the Carrigan and Walker attorney-fee affidavits. This is $189,000.00 less than the amount awarded by the trial court. In response to this court's suggestion of remittitur, White timely remitted this amount from the $398,192.50 awarded by the trial court for work performed in the trial court. We therefore modify the trial court's judgment to change the amount of attorney's fees awarded for work performed in the trial court to $209,192.50[11] *See Long*, 442 S.W.3d at 254; *AMJ Invs.*, 447 S.W.3d at 17–18.

Because we have sustained Enzo's legal-sufficiency challenge to the trial court's award of attorney's fees and suggested a remittitur that would result in a total attorney-fee award that is not excessive, we do not reach Enzo's remaining issue.

---

S.W.3d at 314–15).

[11] Unlike our sister court in *Montano*, we do not treat the attorney's fees awarded by the trial court as the sum of separate awards to each attorney. *See City of Laredo v. Montano*, 415 S.W.3d 1, 6 (Tex. App.—San Antonio 2012) (mem. op.), *rev'd in part*, 414 S.W.3d 731 (Tex. 2013) (per curiam). Here, two of the three attorneys in this case asked the trial court to apply a multiplier to some or all of the fees, and the amount awarded by the trial court is greater than the sum of the lodestar amounts to which the attorneys attested. The trial court could have reached this result by applying a small multiplier to the lodestar fees of all three attorneys, or by applying a larger multiplier to the sum of the lodestar fees of some combination of two attorneys, or by applying a still larger multiplier to the lodestar fees of a single attorney.

## V. CONCLUSION

Because White failed to introduce legally sufficient evidence of the value of his promised share of the business at the time he was to receive it, we conclude that the trial court did not err in granting judgment notwithstanding the verdict as to that component of the damages award. In addition, we conclude that the trial court did not abuse its discretion in denying White's alternative requests for equitable relief. We accordingly affirm the portion of the judgment in which the trial court awarded White actual damages in the amount of $147,500.00.

We further hold that the evidence is legally insufficient to support the full amount of attorney's fees awarded for work performed in the trial court, but the evidence is legally sufficient to support a fee award of $209,192.50. In response to our suggestion of remittitur, White timely remitted $189,000 of the $398,192.50, bringing the total awarded for trial attorney's fees to $209,192.50 and obviating the need for relitigation of that issue. We accordingly modify the judgment to reduce the award of attorney's fees for work performed in the trial court to $209,192.50 and affirm the judgment as modified. *See* TEX. R. APP. P. 46.3.


/s/    Tracy Christopher
        Justice


Panel consists of Justices Christopher, Donovan, and Wise.

31