

# Fourth Court of Appeals
## San Antonio, Texas

**MEMORANDUM OPINION**

**OPINION ON MOTION FOR REHEARING**

No. 04-22-00756-CV

**GRAPEVINE GROUP CONCRETE CONTRACTORS, INC.,**
Appellant/Cross-Appellee

v.

**YC PARTNERS, LTD.** d/b/a Yantis Company and Yantis Corporation,
Appellees/Cross-Appellants

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2018-CI-05255
Honorable Aaron Haas, Judge Presiding

Opinion by:    Lori Massey Brissette, Justice

Sitting:       Irene Rios, Justice
               Lori Massey Brissette, Justice
               H. Todd McCray, Justice

Delivered and Filed: March 4, 2026

REVERSED AND REMANDED

On November 19, 2025, we issued an opinion and judgment reversing the trial court's judgment and remanding the matter for a new trial on all issues. On January 2, 2026, counsel for appellee, YC Partners, Ltd. d/b/a Yantis Company and Yantis Corporation (collectively, "YC"), timely filed a "Request for Conditional Voluntary Remittitur and Motion for Panel Rehearing." Appellant, Grapevine Group Contractors, Inc. ("Grapevine") filed a response to YC's filing as

well as its own "Motion for Rehearing." YC then filed a reply. After considering the request for remittitur, the motions, the response, and the reply, we grant in part YC's motion for rehearing, withdraw our prior opinion and judgment, and substitute this opinion and judgment in its stead. The request and the motions are otherwise denied. *See* TEX. R. APP. P. 46.5, 49.3.

This case involves a complex web of conduct that resulted in a subcontractor walking off two jobs and a contractor having to incur additional expenses to complete both projects. The trial court, as factfinder, was tasked with determining, among other things, which party was first to materially breach the contracts and whether the contractor was liable for failure to pay the subcontractor under the Texas Construction Trust Fund Act and Texas Prompt Pay Act. We reverse the case and remand for a new trial on all issues.

## BACKGROUND

YC, a construction contractor, hired Grapevine as subcontractor to complete concrete work relating to two projects known as the Bandera Road Subdivision Unit 2 ("Bandera") and Toepperwein Bluffs ("Toepperwein").[1] The parties entered into two subcontracts, one for each project, with nearly identical terms. The Bandera subcontract had an estimated value of $207,435.00, which eventually increased to $217,332.00, and the Toepperwein subcontract had an estimated value of $175,447.00.

After working together and securing payment for the first invoices in September, the parties' relationship began deteriorating when YC disputed the progress estimates provided by Grapevine on each project as well as the amount due. Despite these disputes, the parties continued to work together, with Grapevine continuing its concrete work and YC continuing to discuss the necessary revisions and inspecting the work as it progressed. Then, Matt Yantis—YC's owner—

---

[1] The Bandera subdivision where the Bandera project took place was owned by M/I Homes of San Antonio, LLC. The Toepperwein subdivision where the Toepperwein project took place was owned by LECA Construction, LLC.

took the position that YC's payment to Grapevine on the projects would be contingent on Grapevine's satisfaction of an invoice due to Curv Compliance, a separate company owned by Yantis which had provided OSHA safety classes to Grapevine employees. Grapevine initially agreed to this approach, but then later reconsidered, giving notice that it was stopping the work on both projects and would be filing liens. YC bonded around the liens and hired C4 Construction Services, LLC ("C4") to complete the projects.

Grapevine sued YC for, among other things, breach of contract (as to both projects), quantum meruit, failure to comply with the Texas Prompt Payment Act and the Texas Construction Trust Fund Act, and attorney's fees. YC countersued for breach of contract (as to both projects), removal of fraudulent liens, and attorney's fees. After a bench trial, the trial court entered a final judgment granting YC, after all offsets and credits due,[2] damages from Grapevine in the amount of $31,806.37, prejudgment and post-judgment interest, and attorney's fees and court costs of $55,421.01 (along with conditional attorney's fees).[3] The trial court also issued extensive findings of fact and conclusions of law.

Both companies appeal the trial court's ruling raising multiple points of error including: (1) the sufficiency of the evidence to support the trial court's determination of which party first materially breached the subcontracts, (2) the sufficiency of evidence supporting YC's damages, (3) the trial court's calculation of Grapevine's damages, (4) the trial court's ruling as to Grapevine's claim for quantum meruit, (5) the trial court's conclusions as to several claims based on the Texas Property Code, and (6) the award of attorney's fees.

---

[2] The trial court did not delineate in its final judgment the amount of damages awarded to YC or the amount of damages awarded to Grapevine, instead simply setting forth an amount due to YC after offsets and credits.

[3] The court also denied Grapevine's claims against the other defendants, M/I Homes of San Antonio, LLC, Roberto C. Leal, LECA Construction, LLC, and Fidelity and Deposit Company of Maryland and declared Grapevine's liens void.

## FIRST MATERIAL BREACH[4]

Grapevine argues the evidence is legally and factually insufficient to support the trial court's findings that it was the first to materially breach the subcontracts. Further, Grapevine challenges the trial court's finding that YC's non-payment of invoices was not a prior material breach which excused Grapevine's continued performance. Further, Grapevine asserts that, even if it did materially breach the subcontracts, YC's continued performance forfeited its right to discharge its obligations.

**Standard of Review**

Both parties sued, contending the other committed the first material breach. The trial court found in favor of YC. Thus, we must review the evidence, first, to determine whether there is any evidence to support the trial court's finding that Grapevine was the first to materially breach the subcontracts and, second, whether Grapevine conclusively proved that YC was, instead, the first to materially breach the contracts. *See Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (when attacking adverse finding on issue on which appellant did not have burden of proof, it must demonstrate on appeal that no evidence supports adverse finding); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam) (when challenging adverse finding on which appellant has burden of proof, it must demonstrate on appeal evidence establishes, as matter of law, all vital facts in support of issue).

---

[4] "In many disputes over failure of performance, both parties fail to finish performance, and the question is whether one of them is justified in so doing by the other party's failure." RESTATEMENT (SECOND) OF CONTRACTS § 237(b) (1981). "This task can be as enigmatic as the childhood question: 'Which came first—the chicken or the egg?'" *Principle of Cure and Its Implications upon Materiality—Principle of "First Uncured Material Breach" as Justification for Future Contract Nonperformance*, 5 BRUNER & O'CONNOR CONSTRUCTION LAW § 18:16; *see Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 200 (Tex. 2004) ("In the standard contract dispute, one party cancels the contract or refuses to pay due to alleged breaches by the other; in such circumstances, jurors will often find both parties failed to comply with the contract (as the jury did here) unless instructed that they must decide who committed the first material breach.").

If a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate on appeal that no evidence supports the adverse finding. *Graham Cent. Station*, 442 S.W.3d at 263. "We will sustain a legal sufficiency challenge if the evidence offered to prove a vital fact is no more than a scintilla." *Id.* (quoting *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009)) (internal quotation marks omitted).

When we conduct our review, we credit evidence that supports the verdict if a reasonable factfinder could have done so and disregard contrary evidence unless a reasonable factfinder could not have done so. *See id.* In reviewing for legal sufficiency, "the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Dow Chem.*, 46 S.W.3d at 241; *see, e.g., Dowtech Specialty Contractors, Inc. v. City of Weinert*, 630 S.W.3d 206, 215 (Tex. App.—Eastland 2020, pet. denied). This court "indulge[s] every reasonable inference in support of the challenged finding." *Nigerian Found. v. Umezulike*, No. 01-20-00262-CV, 2022 WL 2923202, at *5 (Tex. App.—Houston [1st Dist.] July 26, 2022, no pet.) (mem. op.) (citing *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018)). Only if no evidence supports the finding, do we then turn to "examine the entire record to determine if the contrary proposition is established as a matter of law." *Dow Chem.*, 46 S.W.3d at 241; *see, e.g., Dowtech*, 630 S.W.3d at 215. "The point of error should be sustained only if the contrary proposition is conclusively established." *Dow Chem.*, 46 S.W.3d at 241; *see, e.g.*, *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 333–34 (Tex. 2020).[5]

---

[5] *See generally City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (providing court should sustain legal sufficiency challenge if record shows: (1) complete absence of evidence of vital fact, (2) rules of law or evidence bar court from giving weight to only evidence offered to prove vital fact, (3) evidence offered to prove vital fact no more than scintilla, or (4) evidence establishes conclusively opposite of vital fact).

An appellant attacking the legal sufficiency of an adverse finding on an issue on which it did have the burden of proof "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem.*, 46 S.W.3d at 241*; see, e.g.*, *Dowtech*, 630 S.W.3d at 215.

If an appellant challenges the factual sufficiency of the evidence, "the appellant must demonstrate that the finding is against the great weight and preponderance of the evidence." *Dowtech*, 630 S.W.3d at 215. Thus, for factual sufficiency, we examine "all of the evidence in a neutral light and will reverse only if the evidence [supporting the finding] is so contrary to the overwhelming weight of the evidence as to make the judgment clearly wrong and manifestly unjust." *Texienne Hosp. Sys. L.P. v. KKU Surgical Mgmt., LLC*, No. 14-21-00006-CV, 2022 WL 1310918, at *4 (Tex. App.—Houston [14th Dist.] May 3, 2022, pet. denied) (mem. op).

Finally, it is important to note that, when reviewing the record under any standard, we will not step into the role of the factfinder. We leave it to the trial court in a bench trial to evaluate the credibility of the witnesses and to reconcile any conflicts in the evidence presented. *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency).

**Applicable Law**

Because there were many breaches found by the trial court, the question is which breach was the first material breach, meaning which party committed a breach that operated to discharge or excuse the other from future performance. *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam) (recognizing if "one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance") (quoting *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004)). In *Mustang Pipeline Co. v. Driver Pipeline Co.*, the Supreme Court "outlined several

factors enumerated in the Restatement [(Second) of Contracts] . . . significant in determining whether a failure to perform is material." *Bartush-Schnitzius Foods Co.*, 518 S.W.3d at 436 (quoting *Mustang Pipeline*, 134 S.W.3d at 196). These include:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and]
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Bartush-Schnitzius Foods*, 518 S.W.3d at 436–37 (quoting *Mustang Pipeline*, 134 S.W.3d at 199).[6]

A trial "court's primary consideration in determining the materiality of a breach is the extent to which the other party will be deprived of the benefit it reasonably could have anticipated had the breach not occurred." *Piwko v. Acevedo*, No. 05-23-00135-CV, 2024 WL 3198891, at *7 (Tex. App.—Dallas June 27, 2024, no pet.) (mem. op.) (citing *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994)). "The less the other party is deprived of the expected benefit, the less material the breach." *Id.*; *see, e.g.*, *701 Katy Bldg., L.P. v. John Wheat Gibson, P.C.*, No. 05-16-00193-CV, 2017 WL 3634335, at *5–8 (Tex. App.—Dallas Aug. 24, 2017, pet. denied) (mem. op.) (applying *Mustang Pipeline* factors and concluding appellant did not conclusively establish that appellee materially breached lease by certain date). If, based on these factors, the court concludes "a party commits a nonmaterial breach, the other party 'is not excused from future

---

[6] Indeed, *Mustang Pipeline* also enumerated additional Restatement factors that could be significant in determining the materiality of a party's breach. *Mustang Pipeline*, 134 S.W.3d at 199. These factors are "(1) the extent to which it reasonably appears to the injured party that delay may prevent or hinder him in making reasonable substitute arrangements"; and (2) the extent to which the circumstances call for performance without delay, where for example time is of the essence. *Id.*

performance but may sue for the damages caused by the breach.'"[7] *Bartush-Schnitzius Foods*, 518 S.W.3d at 436 (quoting *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App.–Houston [1st Dist.] 2014, pet. denied)).

If a party materially breaches a contract, and the non-breaching parties' duties are discharged, the nonbreaching party must choose whether to treat the contract as terminated based on the material breach or to continue as if the breach had not occurred. *See, e.g.*, *Man Indus. (India), Ltd. v. Midcontinent Exp. Pipeline, LLC*, 407 S.W.3d 342, 368 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). A party treating "'a contract as continuing deprives himself of any excuse for ceasing performance on his own part.'" *Long Trusts v. Griffin*, 222 S.W.3d 412, 415 (Tex. 2006) (per curiam) (alteration in original) (quoting *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982)). A nonbreaching party treats the contract as continuing if it seeks to benefit from it after the other party's material breach. *See Man Indus. (India), Ltd.*, 407 S.W.3d at 368; *see also Long Trusts*, 222 S.W.3d at 415–16.

**The Trial Court's Findings and Conclusions**

Because the trial court rendered nearly 130 findings, in a document more than forty pages long, we summarize the pertinent findings below. First, the trial court found Grapevine materially breached the subcontracts by:

- Not performing in a good and workmanlike manner
- Not obtaining YC's permission for change orders
- Not submitting a complete list of, or obtaining permission for, proposed laborers;

---

[7] Moreover, "[w]hile a party's nonmaterial breach does not excuse further performance by the other party, neither does the second breach excuse the first. To the contrary, a material breach does not discharge a claim for damages that has already arisen." *Id.* at 437. This supports the trial court's finding that, while YC did not materially breach the subcontracts, it may still be liable to Grapevine for damages.

- Not submitting properly prepared progress estimates, which were a condition precedent to YC's duty to pay;[8]
- Not fully completing its scope of work to YC's satisfaction; and not furnishing satisfactory evidence that (a) Grapevine paid in full all persons furnishing labor or materials,[9] and (b) neither Grapevine nor any person claiming under or through Grapevine had filed or had the right to maintain a lien or other claim against the owner, YC, or YC's surety; or (c) that Grapevine delivered all guaranties, warranties, bonds, and other items required to be delivered to YC, including a final waiver of lien and complete release.

In the end, the trial court found Grapevine unjustifiably terminated the subcontracts when it walked off the job on both projects without completing the full scope of work required. Based on these findings, the trial court concluded: (1) Grapevine materially breached the subcontracts, (2) YC substantially performed its contractual obligations and was excused from performing other contractual obligations because of Grapevine's prior material breaches, and (3) any breach of the subcontracts by YC was non-material and occurred after Grapevine's prior material breach.

### Laborer Lists

The first-in-time alleged material breach was Grapevine's failure to submit a list of laborers to be utilized on each project within thirty days of the subcontracts and to secure YC's approval of those lists prior to any work being done by them. The subcontracts each provide that a breach of the provision requiring the laborer list "shall constitute a material breach" of the subcontracts. In Texas, "[a]bsent compelling reasons, courts must respect and enforce the terms of a contract the

---

[8] The trial court made numerous and very specific findings as to the invoices submitted by Grapevine, finding that each of the unpaid Grapevine invoices were supported by progress reports that falsely stated the percentage of work completed. The trial court found that YC was not obligated to pay such invoices as a result.

[9] The trial court found that Grapevine failed to pay subcontractors for the materials and labor provided and that, as a result, the subcontractors filed liens against the projects requiring YC to bond around the liens in order to complete the projects. Specifically, the trial court found Grapevine engaged Alamo Concrete, CMC Construction Services, Texas South to provide materials for both projects, but failed to pay them for materials and labor provided. It found Grapevine failed to pay Alamo Concrete $10,379.01 for Bandera and $32,961.60 for Toepperwein. It found Grapevine failed to pay CMC $21,483.99 for Bandera and $26,477.65 for Toepperwein. It found Grapevine failed to pay Texas South $3,091.21 for Bandera and $3,185.50 for Toepperwein. Further, Grapevine engaged and failed to pay L&M Steel $750.17 for Toepperwein. The trial court found that each of these contractors filed a mechanic's lien. Further, the trial court found that YC paid them and was, per the terms of the subcontracts, entitled to recover the amounts paid. Finally, because YC was required to bond around the liens, it had to pay and is entitled to recover the $3,433.00 it paid in bond premiums for Bandera and the $3,798.00 it paid in bond premiums for Toepperwein.

parties have freely and voluntarily entered." *Phila. Indem. Ins. v. White*, 490 S.W.3d 468, 471 (Tex. 2016).

The parties do not dispute Grapevine failed to provide these lists or secure YC's approval.[10] The Bandera Subcontract was signed August 10, 2017 and Toepperwein was signed approximately one month later, on September 6, 2017. Thus, Grapevine breached this provision no later than September 10, 2017 (Bandera) and October 6, 2017 (Toepperwein). Further, there was no breach by YC, much less a material one, occurring before that date. Grapevine's breach as to both subcontracts would therefore be the first to possibly constitute a material breach.

But, while there were no specific duties for YC to perform at this juncture, the evidence is undisputed that YC did not terminate the subcontracts as it was authorized to do and instead continued to work with Grapevine, calling on it to perform as promised long after this breach. By doing so, it forfeited the right to rely upon this breach to excuse its obligations under the subcontracts. *See Long Trusts*, 222 S.W.3d at 415.

### Properly Prepared Progress Estimates

The trial court next found that Grapevine materially breached the contract by failing to include with its invoices to YC properly prepared progress estimates. In so finding, the trial court referenced October and November invoices (including revised versions of same) and the final earned retainage invoice for both projects. The trial court, by finding a material breach in this regard, also impliedly found YC's decision to treat the subcontracts as continuing did not deprive it of the right to use Grapevine's breach as an excuse of its own performance. *See Long Trusts*,

---

[10] Farrell testified Grapevine never provided this list. Grapevine contends the provision is about temporary laborers only; and Houchens provided similar testimony. This is belied, however, by the agreement's language, which does not refer to temporary laborers. Further, nothing in the record shows the trial court's findings were legally or factually insufficient in impliedly finding the provision did apply to all laborers, not only temporary laborers. *See 425 Soledad, Ltd.*, 709 S.W.3d at 561.

222 S.W.3d at 415. Grapevine not only challenges these findings but asserts that YC materially breached the contract by failing to pay Grapevine for the work performed in October and November, causing it—in Grapevine's view—to walk off the jobs in mid-December. To address the sufficiency of evidence, we first detail the timeline of events as set forth in the record.

On October 23rd, Grapevine's President, John Houchens, emailed the October invoice for the Bandera project to YC's Bandera project manager, Adam Farrell. The invoice included an estimate that Grapevine had completed 100% of the work. When Farrell indicated he would go to the site to check percentage of completion, Houchens clarified that the invoice referred to work that would be completed by the end of the month. On November 1st, Farrell replied to Houchens stating he could not approve the October invoice for payment because several items were still not complete, specifically providing pictures showing wooden formwork and rebar for a sidewalk with concrete yet to be poured and retaining walls that were left unfinished.[11] Despite this dispute, the parties continued to work together to address the issues related to the October invoice—and otherwise continued to perform under the subcontract. For example, Frank Cabrera, a Grapevine Senior Project Manager, exchanged several emails with Farrell between November 10th and 13th discussing the Bandera project, specifically the top of the Drain C retaining wall, its rebar inspection, closing the retaining wall, and whether the sidewalks needed an inspection.

Also on October 23rd, Houchens sent Jenson Nickel, YC's Toepperwein project manager, the October invoice for the Toepperwein project. About two weeks later, on November 6th, Nickel emailed back asking Houchens for the remaining pour schedule and noting YC needed Grapevine to finish "by early next week." Houchens responded that "[a]ll will be done this week." Nickel then followed up on November 13th, noting there was no pour the previous week and asking when

---

[11] But, on November 2nd, YC was paid by the Bandera project owner for Grapevine's October work, which YC represented to the project owner was 95-100% completed.

it would occur. A few days later, Nickel emailed Houchens, stating he could not approve the October invoice since it was "billed for 100%" while there was still work to do. Nickel offered Grapevine the opportunity to revise the estimate and Houchens indicated he would review it and get back to him.

On November 21st, Grapevine sent to YC revised October invoices for both projects and invoices for work completed in November. For Bandera, Houchens testified he submitted a revised October invoice estimating the project was 89% complete after much back-and-forth discussion with Farrell. The Bandera November invoice indicated the project was 100% complete, with Houchens again testifying this referred to work that would be completed by the end of the month. Houchens and Farrell both testified that the project was not 100% complete when the November invoice was received. In fact, Grapevine never completed 100% of the work required for the Bandera project. Likewise, for Toepperwein, the revised October invoice represented 71% of the project was complete and the November invoice indicated 100% completion. Yet, on November 28th, Nickel had to email Houchens to ask if Grapevine would finish the job that week and stated, "It just seems like each week goes by and no additional pours are made."

On November 29th, Matt Yantis emailed Houchens about conversations between him, YC's Chief Operating Officer Briones and the project managers for both projects to address payment to Grapevine. He stated YC "would pay all invoices net 30." Later that same day, Farrell emailed Houchens requesting that Grapevine revise and resubmit the bills, billing the October work in November and the November work in December. Farrell committed to approving the revised October invoice for a payment of $38,000, due thirty days after its November 21st submission.

The following day, on November 30th, Farrell again emailed Houchens, stating he could not approve it because the work was not complete. He also requested changes to the November

invoice, stating he would process it as soon as he received a revised invoice that reflected his requested changes.[12] Farrell confirmed he would pay the final earned retainage in December if the project was completed. Houchens responded that Grapevine had invoiced for work and materials Farrell had acknowledged was provided in October and that if YC chose not to pay the October invoice Grapevine would have to "protect its interests and those of our vendors that supplied materials on this project." The email exchange continued between Farrell and Houchens regarding whether work could be billed for October until Briones stepped in to clarify, "All I need is a revised bill. A lien won[']t be valid since the bill was not correct. [T]here is no need to lien the job. Get us a revised bill and we will get you paid." On December 5th, Houchens agreed he would revise the October invoice but would bill the remainder in November or, he could charge for change orders required due to YC delays. Houchens then emailed the revised invoice, estimating completion at 87%.

On December 7th, Yantis emailed Houchens stating, "[w]e have a check cut for you for [YC] work" for October. But, he went on to state the YC check would be delivered when Grapevine paid Curv Compliance, a separate company owned by Yantis that had provided safety courses to Grapevine's employees under a separate contract.[13] He offered, as an alternative, to offset the amounts YC owed to Grapevine by the amount Grapevine owed Curv. Houchens replied that he would bring a check for Curv when he came to retrieve YC's payment to Grapevine, asking

---

[12] Farrell's revisions changed the total due in November from $21,000 to $43,521.30 and changed the percentage completed from 100% to 95%.

[13] It is undisputed that the amount owed to Curv Compliance had nothing to do with the work being provided by Grapevine for YC on Bandera and Toepperwein.

that the OSHA certificates be prepared and ready for pickup when he arrived. Yantis replied, "No problem."

Then, on December 8th, Houchens received an email from YC with blank lien releases requested and a copy of a check for $54,000 attached, representing what would be payment for October invoices relating to both projects. The email also asked Houchens if he planned to pick up the check personally and reminded him of the need for unconditional supplier releases. On December 14th, YC revised its position via email, stating Grapevine needed to provide "at least conditional supplier releases" and a check for Curv in exchange for the October invoices. Houchens provided a release for the Toepperwein project, and YC responded that it needed the same for Bandera but also reminded Houchens once again that he needed to pay Curv when picking up the October check from YC. Houchens responded that he would be working on Grapevine's notice of default and work stop and informing its vendors to do the same. He added that he would pay Curv when Grapevine is paid and that he believed YC had the conditional releases for both projects relating to October. Yantis replied the same day stating, "You[r] invoices have been wrong every single month. You can do . . . whatever you feel necessary, but we have to ensure that you are paying your vendors. If it would be easier for us to cut joint checks to them, we can do that." Yantis reiterated the past due amount owed to Curv and said, "Let's just get these jobs finished and we can part ways."

But, prior to December 14th, the day Houchens notified YC it would be stopping work on the projects, the parties were continuing to perform under the subcontracts. On December 11th, Farrell and Cabrera communicated about a pour at the Bandera project and planned to meet to go over it. A few days later, on December 13th, Houchens emailed Farrell about authorization for a

change order for Drain C. And, on December 14th, Nickel emailed Houchens regarding Toepperwein, stating he met with Cabrera to discuss a final pour scheduled for December 18th.

Later on December 14th, Houchens replied that Grapevine was stopping work on the projects immediately and would be filing liens due to nonpayment and the vendors' refusal to supply any additional materials absent payment. But, in the same email, Houchens stated, "[w]e can finish these 2 projects, but we will have to be paid all to date, October, November and all earned retainage plus any incurred legal fees for the filing of liens on these projects." Yantis replied, first reminding him that Curv had not been paid, and stating, "If you choose to pull off the job . . . we will bond around the liens and find someone else to . . . finish the work." Houchens replied with conditional waivers attached for both projects, asserted YC was breaching the contract by withholding payment, stated Curv would be paid when it provided the certificates of completion, and added that Grapevine would be proceeding with the filing of liens and stopping work on both projects. Yantis replied by, once again, offering to pay the vendors directly.

On December 15th, Houchens sent an email to Farrell attaching a revised November invoice for Bandera along with the remaining earned retainage invoice for that project, actually reducing the amount owed due which resulted from a deductive change order. In both invoices Grapevine indicated the project was 100% complete. Farrell replied that such was not the case, asked when it would complete the job, and declined to pay the invoices. Houchens responded that these invoices were the final request for payment, for all contract items that were completed up to the time work was stopped. Houchens then provided notice to YC, pursuant to Section 53.056 of the Texas Property Code of Grapevine's claim for $67,948.30 relating to Bandera. At that point,

YC took action to hire C4 Construction Services, LLC to finish the job. Three days later, on December 18th, Grapevine filed a notice of lien on Bandera.

On December 22nd, counsel for YC wrote to Houchens demanding release of the lien, noting it violated Section 53.056 of the Texas Property Code, and asserting Grapevine was in default of the subcontract because it abandoned the job leaving work to be completed and defective work to repair. On January 3rd, YC's counsel again wrote to Houchens notifying him that YC was withholding payment because of a good faith dispute regarding whether the work was completed and performed in a proper manner. On January 9th, YC filed a bond to release the lien. Grapevine was never paid for work performed on Bandera in October, November, or in relation to the final earned retainage invoice.

Likewise, on Toepperwein, Houchens emailed Nickel and others on December 15th with the revised November invoice and final earned retainage invoice, providing notice of its actions pursuant to Section 53.052 (retainage), Section 53.056 (mechanic's lien), and Section 162.001 (Trust Fund statute) of the Texas Property Code relating to Grapevine's claim for $82,678.46 for labor and materials left unpaid on Toepperwein. Three days later, YC was notified that four Toepperwein vendors, Alamo Concrete, CMC, Texas South, and L&M Steel, had filed liens for amounts owed. Four days later, YC's counsel demanded Grapevine release its lien on Toepperwein, advised Grapevine that YC would secure an indemnity bond if the lien was not released, and that it would file suit for damages and attorney's fees relating to Grapevine's breach of the subcontract. As it did on Bandera, YC then contracted with C4 to finish the job. Grapevine

was not paid for work performed in October, November, or the final earned retainage as to Toepperwein.

### Is the Evidence Sufficient to Support a Finding that Grapevine Committed a Material Breach By Failing to Provide Proper Progress Estimates?

Even if we assume that Grapevine presented progress estimates and invoices that did not accurately reflect the work completed and that YC was, therefore, relieved of its obligation to pay the invoices,[14] the evidence is insufficient to support the trial court's finding that Grapevine's failure in this regard constituted a material breach that discharged YC of all further duties under the contract. *See Long Trusts*, 222 S.W.3d at 415–16.[15] Instead, the record conclusively demonstrates that the parties continued to perform under the contract and treated it as continuing through at least December 14th. By doing so, just as it did with regard to the laborer lists, YC forfeited the right to rely upon this breach to excuse its obligations under the subcontracts. *See Long Trusts*, 222 S.W.3d at 415–16. Thus, the evidence is legally insufficient to support the trial court's finding that Grapevine's failure to present proper progress estimates constituted a material breach that relieved YC of its further obligations.[16]

### Does the Record Conclusively Establish that YC's Failure to Pay the Invoices was a Material Breach?

YC, in fact, agreed that at least some amount was due to Grapevine when, on December 7th and 8th, it notified Grapevine that a check had been cut and was awaiting pickup or delivery.

---

[14] Of note is the provision in both subcontracts that makes Grapevine's duty to provide proper progress estimates a condition precedent to YC's duty to pay. But because we conclude the parties continued to perform, and any material breach was therefore waived, we need not consider whether the provisions constituted conditions precedent and, if they were, whether such conditions precedent can constitute a material breach. *See* TEX. R. APP. P. 47.1.

[15] Because we conclude the evidence is legally insufficient, we need not address whether it is also factually insufficient. *See* TEX. R. APP. P. 47.1.

[16] For these same reasons, we conclude, that at this temporal juncture, the evidence was legally insufficient to conclude Grapevine failed to complete its work in a good and workmanlike manner under paragraph 1 of the Bandera Subcontract.

Grapevine contends that YC's failure to make such payment, conditioning it instead on Grapevine's satisfaction of amounts owed to a separate company—Curv Compliance—constituted a material breach. But, while it is clear that YC had no legal right to do so, the evidence demonstrates that Grapevine at least initially agreed to YC's demand. In fact, in response to YC's demand that the Curv invoice be satisfied at the same time the check is delivered, Houchens responded that he would bring a check and asked that the safety course certificates be made ready. Yantis replied, "No problem." In the very next email, Houchens reiterated that he would bring a check to pay Curv when he picked up YC's check. Then, the next day, on December 8th, YC sent another email with a copy of the check attached which does not mention Curv and states, "Attached is a check and lien releases, please sign the lien releases and email back to me. Please let me know if you plan on picking up the check or if you would like me to mail it."[17]

Most certainly, a subcontractor needing payment to satisfy vendors and keep the project moving would be seriously derailed by a significant reduction in the amount being paid on the contract, particularly when the amount being deducted bears no relation to the work performed on the projects in question. A trial court's "primary consideration in determining the materiality of a breach is the extent to which the other party will be deprived of the benefit it reasonably could have anticipated had the breach not occurred." *Piwko*, 2024 WL 3198891, at *7. But, here, the evidence does not demonstrate how significant the impact was—in other words, how much Grapevine owed to Curv or how much was being proposed to be withheld by YC. Without that information, while we see support for Grapevine's contention that YC's actions in this regard could

---

[17] Notably, Grapevine's agreement to pay Curv out of the balance owed by YC could have caused other problems. The subcontracts both state, and the trial court found, that YC is required to pay Grapevine, upon receipt of payment from the owner, an amount equal to the value of Grapevine's completed work and that such payments will be held by Grapevine as a trust fund to be applied first to the payment of its subcontractors, laborers, and suppliers before using the payment for any other purpose.

cause a material breach, we cannot hold that the record demonstrates YC's material breach conclusively, as a matter of law.

### Did Grapevine Commit the First Material Breach When It Stopped Work?

Then, in the absence of a prior material breach by YC, we are left with Grapevine's decision to stop work on December 15th, leaving the projects incomplete. Turning to the *Mustang Pipeline* factors, Grapevine's work stoppage clearly deprived YC of the benefit of the completion of the project—a benefit it reasonably expected. *See Mustang Pipeline*, 134 S.W.3d at 199.

It is true YC had already made clear, at this point, it was withholding payment due to the lack of proper progress reports and because it contended work was incomplete and, in some instances, defective. Further YC took the position that it needed releases from suppliers and the payment for Curv. But Grapevine did not immediately cease performance. Instead, the evidence shows it treated the contract as continuing and indicated it intended to comply with YC's requirements.[18] *See Mustang Pipeline*, 134 S.W.3d at 199.

Turning to the second factor, YC of course, could be adequately compensated for the incomplete work by demonstrating damages for Grapevine's failure to complete the work. *See Mustang Pipeline*, 134 S.W.3d at 199. Indeed, it presented evidence at trial that it hired C4 to complete the work. However, it is also true that Grapevine, as the party failing to perform or to offer to perform, was at risk of suffering forfeiture because of YC's nonpayment for work already completed. In fact, Grapevine was never paid for the invoices it submitted after September. *See Mustang Pipeline*, 134 S.W.3d at 199. And, there was also little likelihood, at this juncture, that Grapevine would cure its failure to perform because YC made clear it was not paying without payment to Curv. *See Mustang Pipeline*, 134 S.W.3d at 199.

---

[18] Grapevine concedes this in its appellant's brief.

Turning to the fifth factor, Grapevine's work stoppage on the subcontracts was the result of YC making clear it was holding its payment hostage for Grapevine's payment for Curv classes. *See Mustang Pipeline*, 134 S.W.3d at 199. But Grapevine had previously acceded to these demands and, in fact, demanded that the certificates be made ready so that such transaction could occur. We therefore cannot conclude Grapevine's actions in stopping work comported with the standards of good faith and fair dealing, the fifth factor under *Mustang Pipeline*.[19] *See* 134 S.W.3d at 199.

While fingers could be pointed at both parties for causing the demise of the relationship, it is not our job to step into the role as factfinder, but simply to review for sufficiency the decisions made by the trial court. Because more than a scintilla of evidence supports the trial court's findings, we cannot conclude the evidence is legally insufficient to support the trial court's finding that Grapevine's decision to stop the work on both projects constituted the first material breach. Nor can we conclude the findings of a material breach by Grapevine as to the work stoppages, under these circumstances, is so contrary to the overwhelming weight of the evidence as to make the judgment clearly wrong or manifestly unjust. The evidence is therefore also factually sufficient to support the trial court's finding that Grapevine's work stoppage constituted a material breach on both projects. *See Texienne Hosp. Sys. L.P.*, 2022 WL 1310918, at *4; *see Dowtech*, 630 S.W.3d at 215–16 (factfinder, not this court, is tasked with "evaluat[ing] the credibility of the witnesses and

---

[19] *See Covenant*, BLACK'S LAW DICTIONARY (12th ed. 2024), *available at* Westlaw (listing under definition of covenant is the implied covenant of good faith and fair dealing, providing "[a]n implied covenant to cooperate with the other party to an agreement so that both parties may obtain the full benefits of the agreement; an implied covenant to refrain from any act that would injure a contracting party's right to receive the benefit of the contract"). Although the fifth factor addresses whether a party's actions comport with the "standards of good faith and fair dealing," the Texas Supreme Court has made clear that there is no default implied covenant of good faith and fair dealing in every Texas contract. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 491 (Tex. 2019). Instead, it only arises when the contract "governs or creates a special relationship." *Id.* at 490. Nevertheless, *Barrow-Shaver* did not overrule *Mustang Pipeline*, and the *Mustang Pipeline* factors remain Texas law when evaluating a material breach. *See, e.g.*, *Bartush-Schnitzius Foods*, 518 S.W.3d at 436 (applying *Mustang Pipeline* factors).

reconcil[ing] any inconsistencies or conflicts in the evidence" and we may "not substitute our opinions on credibility for those of the factfinder").

Here, because the evidence is sufficient to support the trial court's findings as to Grapevine's prior material breach for the work stoppage, YC was excused from future performance from that point on. *See, e.g.*, *Bartush-Schnitzius Foods*, 518 S.W.3d at 437 ("In other words, a material breach excuses *future* performance, not past performance."). And because this finding has no effect on whether Grapevine would be entitled to damages for nonmaterial breaches, *see id.* at 436, any error with respect to the trial court's findings of Grapevine's prior material breach *before* the work stoppage is harmless because it did not cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *see, e.g.*, *Mission Ridge P.U.D. Homeowners Ass'n, Inc. v. Hines*, No. 04-18-00214-CV, 2019 WL 691503, at *3 (Tex. App.—San Antonio Feb. 20, 2019, pet. denied) (mem. op.) (providing "trial court's findings of fact need only be sufficient to support the judgment," "[e]ven if the trial court erred by making irrelevant or unsupported findings of fact, we cannot reverse the trial court's judgment unless these findings were harmful," and further finding trial court's judgment independently supported by other finding).

### YC's Damages—Reasonable and Necessary

Grapevine argues the evidence is legally insufficient to support the damages award to YC, specifically pointing to the lack of expert testimony that the completion damages incurred by YC were reasonable and necessary. YC contends the trial court, contrary to Grapevine's contentions, actually *denied* Grapevine's motion to exclude expert testimony relating to such damages and permitted both YC and C4 witnesses to testify as to the deficiencies and defects in Grapevine's

work, the work required to remedy those defects, and the costs of completion.[20] Grapevine counters that the trial court erred in not excluding such evidence.

**The Trial Court's Rulings**

On April 6, 2022, Grapevine moved to exclude YC's designated expert witnesses, David Cabaza and Jerome D. DeSalme of C4 and Farrell, Nickel, and Briones of YC, because YC failed to sufficiently disclose the general substance of their opinions and the basis for same. YC's disclosures stated that each of these witnesses would testify "as to the deficiencies and defects with Grapevine's work at the time Grapevine abandoned the projects, the work required to remedy the defects and complete Grapevine's work on both projects, and the cost to remedy the defects and complete the work on both projects."

On May 3, 2022, the trial court denied Grapevine's motion to exclude the expert testimony, noting the disclosures provide notice of the subject of their testimony, noting the absence of unfair surprise or prejudice, and noting the fact that Grapevine had an opportunity to depose the witnesses. Grapevine took the position then that the disclosures do not disclose that the experts would testify as to the reasonableness or necessity of the costs mentioned. The trial court made no ruling as to that issue and Grapevine did not press for one, prior to the time the experts testified. Later, at trial, the court's rulings were at best inconsistent, with the trial court at times sustaining

---

[20] In the alternative, YC asserts it had no contractual obligation to prove completion damages were reasonable and necessary because such a requirement is not included in the subcontracts. Damages for breach of contract are limited to "just compensation for the loss or damage *actually* sustained." *Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020) (emphasis added). Generally, there are "two measures of damages for the breach of a construction contract." *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012). Those are: (1) remedial damages, which is the cost to complete or repair less the unpaid balance on the contract price, and (2) difference-in-value damages, which is the difference between the value of the building as constructed and its value had it been constructed according to the contract. *Id.*; *see also Nigalye v. Orr*, No. 11-12-00003-CV, 2013 WL 4715922, at *2 (Tex. App.—Eastland Aug. 30, 2013, no pet.) (mem. op.). YC plainly sought cost of completion. As the party seeking to recover costs of completion, YC was ordinarily required to prove the damages sought were reasonable and necessary. *See, e.g.*, *McGinty*, 372 S.W.3d at 627; *Mustang Pipeline*, 134 S.W.3d at 200. Proof of "amounts charged and paid, standing alone, is no evidence that such payment was reasonable and necessary." *Mustang Pipeline*, 134 S.W.3d at 200–01 (concluding party failed to present evidence costs were reasonable when evidence merely detailed amount it spent to complete work on contract and not whether contracted amount was reasonable); *see McGinty*, 372 S.W.3d at 627.

Grapevine's objection that the experts went beyond their disclosure in addressing reasonableness of costs incurred and at other times overruling the same objection to similar testimony.[21]

**Analysis**

Here, the question is whether the scope of expert disclosures covered the reasonableness and necessity of the costs incurred by YC, or whether they even needed to. We first note that expert testimony is not always required to prove that costs incurred were reasonable and necessary. Such damages can be proven through lay opinion testimony and other evidence admitted at trial. *See Demiraj v. Martinez*, No. 01-23-00493-CV, 2025 WL 626430, at *7–8 (Tex. App.—Houston [14th Dist.] Feb. 27, 2025, no pet.) (mem. op.) (concluding evidence legally sufficient to show amount paid was reasonable and necessary where witness and admitted photographs identified incomplete work and required repairs and testimony showed the amount paid was consistent with what other contractors would charge), *modified and supplemented by* No. 01-23-00493-CV, 2025 WL 863775 (Tex. App.—Houston [14th Dist.] Mar. 20, 2025) (mem. op.) (vacating judgment, but not opinion, and affirming trial court's judgment as modified, based on party timely filed remittitur and otherwise affirming judgment as modified); *accord.* TEX. R. EVID. 701 (lay witness opinion testimony limited to that rationally based on witness's perception). Nor do parties have to invoke testimony using "reasonable" and "necessary" as magic words. *See Dumler v. Quality Work by Davidson*, No. 14-06-00536-CV, 2008 WL 89961, at *2 (Tex. App.—Houston [14th Dist.] Jan. 10, 2008, no pet.) (mem. op.) (citing *Hernandez v. Lautensack*, 201 S.W.3d 771, 776–77 (Tex.

---

[21] Farrell, upon being questioned about the C4 quote to finish Bandera project, replied that it "seemed reasonable." Grapevine objected and the trial court sustained the objection. YC then explained that Farrell would testify as to the costs to complete and repair, and the trial court agreed that that was permissible testimony. Later, when YC asked Briones whether the amounts YC paid to complete both projects was "necessary or required to complete the work under Grapevine's scope of work" and whether the amounts were "consistent with other pricing of similar work in San Antonio and the surrounding areas," the trial court overruled Grapevine's objection that it was "beyond the scope of his designation." Yet, after Briones testified the pricing was "consistent with costs for the projects in and around those areas," the trial court sustained Grapevine's objection to the next question which asked whether the cost of completion was "reasonable in San Antonio and surrounding areas."

App.—Fort Worth 2006, pet. denied)). The injured party merely has to present sufficient competent evidence to allow the trier of fact to conclude any such completion or repair costs are reasonable and necessary. *See Dumler*, 2008 WL 89961, at *2; *Hernandez*, 201 S.W.3d at 777 (holding evidence was legally sufficient to support actual damages awarded "as the reasonable cost of replacing" roof when replacement cost was compared to amount appellant originally charged, amount appellant proposed to replace roof, and amount another roofer proposed); *see also AdvanTech Constr. Sys., LLC v. Michalson Builders, Inc.*, No. 14-21-00159-CV, 2023 WL 370513, at *12 (Tex. App.—Houston [14th Dist.] Jan. 24, 2023, no pet.) (mem. op.) (concluding rational factfinder could have concluded completion costs reasonable and necessary where cost of completing construction project was less than half of original cost of project).

The trial court admitted testimony by Briones as to whether C4's work was necessary or required and whether the amount C4 charged was consistent with other pricing of similar work in the San Antonio area. In addition, Farrell, Houchens, and DeSalme extensively testified as to (1) the scope of work required by Grapevine to complete both projects, (2) Grapevine's incomplete work, supported by photographic exhibits, (3) the scope of work required by C4 to complete Grapevine's incomplete work, and (3) YC's cost to pay C4 for the completion of Grapevine's work. Further, without objection, DeSalme testified as to his experience as an estimator on concrete projects and the work he did to identify the labor and material needed to complete the job, then generating an estimate with "his bid numbers." DeSalme further testified the quote by C4 provided on the Bandera and Toepperwein projects was consistent with the price charged by other companies for similar work. Because Grapevine did not object to much of the evidence offered to prove the costs incurred were reasonable and necessary and because the finding need

not be solely supported by designated expert testimony, we conclude the evidence is legally sufficient to support the trial court's findings that YC's damages were reasonable and necessary.[22]

## THE TRIAL COURT'S DAMAGES CREDIT TO GRAPEVINE

For distinct reasons, the parties challenge the trial court's final judgment and findings of fact related to the trial court's final award of $31,806.37 to YC in damages, offsetting Grapevine's damages against YC's damages.[23] Thus, we turn to whether the trial court appropriately calculated the offset based on the evidence before it. YC challenges the trial court's credit to Grapevine, and ultimately the award to YC of $31,806.37 after the offset, arguing the trial court's actions were "legal error" that resulted in a miscalculation.

Specifically, YC urges that the trial court erred by computing the offset using the original total value of the subcontracts (in other words, the amount that would have been owed had the subcontracts been performed in full) rather than the amounts invoiced by Grapevine for work

---

[22] Grapevine also argues the evidence is legally and factually insufficient to support the trial court's finding that YC incurred completion damages in the amount set forth. Based on our analysis above showing the extensive testimony regarding YC's reasonable and necessary completion damages, we cannot conclude the evidence was legally or factually insufficient as to the amount incurred. *See Texienne Hosp. Sys. L.P.*, 2022 WL 1310918, at *4. Grapevine further argues the evidence is legally insufficient to support the trial court's findings that YC incurred "24,575.20 which must be paid to release CMC's and Texas South's liens on the Bandera Project." But, the evidence showed YC would have had to pay $21,483.99 and $3,091.21, to CMC and Texas South, respectively, in the form of the liens attaching the invoices as well as testimony as to the same from Houchens.

[23] There is some dispute as to a purported conflict between the trial court's final judgment, wherein it stated both parties prevailed on their breach of contract claims and awarded damages to YC offset by damages owed by YC to Grapevine, and the trial court's findings of fact and conclusions of law wherein it held Grapevine committed numerous material breaches and that YC did not commit a prior material breach. The Texas Rules of Civil Procedure provide that "[i]f there is a conflict between findings of fact recited in a judgment in violation of this rule and findings of fact made pursuant to Rules 297 and 298 [wherein parties request findings of fact and conclusions of law separate from the judgment], the latter findings will control for appellate purposes." TEX. R. CIV. P. 299a; *see, e.g.*, *Borusan Mannesmann Pipe US, Inc. v. Hunting Energy Servs., LLC*, 716 S.W.3d 572, 575 n.2 (Tex. 2025) (per curiam) (citing Rule 299a for same). But, we do not find a conflict. Although it found YC did not commit a prior material breach, the trial court concluded Grapevine was entitled to an offset for work performed, impliedly finding a breach, albeit not a material one, that excused Grapevine's further performance. *See Mustang Pipeline*, 134 S.W.3d at 196 (recognizing that only material breach discharges or excuses other party from further performance); *see also Bartush-Schnitzius Foods*, 518 S.W.3d at 436 (recognizing that nonmaterial breach can give rise to claim for damages even when further performance is not excused). Thus, the trial court's statement in the final judgment that both parties breached and its finding that Grapevine committed the first material breach, read together, allows for YC to recover completion damages while providing Grapevine an offset to recover for the costs of work performed but not paid for.

actually performed. While there are no findings of fact made by the trial court as to how the amount was calculated, the record is clear, and both parties seem to agree, that the trial court calculated Grapevine's offset to be $172,279 by subtracting the payments made by YC to Grapevine ($220,500.00) from the total combined value of the subcontracts at their inception ($392,779.00). *See State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 413 (Tex. 2023) (providing we must imply all relevant facts necessary to support judgment that are supported by evidence). YC contends the trial court should have, instead, computed the offset by subtracting the amounts paid by YC to Grapevine ($220,500.00) from the amounts invoiced by Grapevine for work performed, which it contends totals $283,500.00. This alternative calculation, proposed by YC, would create an offset of $63,000, leaving Grapevine owing to YC damages in the amount of $141,085.37 instead of the $31,806.37 awarded.

Grapevine, on the other hand, urges us not to disturb the damages award because it is supported by sufficient evidence presented at trial. First, it contends the evidence supports the trial court's calculation because YC admitted an exhibit that includes both calculations, one based on the full amount of the contracts (which was adopted by the trial court), and one based on the amount of unpaid but completed work. But, while YC presented both ways to calculate the award, it clearly asserted that if the appropriate calculation is that amount of work completed but left unpaid, the offset is $63,000. Alternatively, Grapevine shows that its own evidence demonstrated at trial that the amount it was still owed under the outstanding invoices is $159,632.96. But, even utilizing this amount due as an offset would leave Grapevine owing $44,452.41 instead of the $31,806.37 awarded, still more than the trial court's damages award to YC.

It is clear the trial court erred in calculating the offset by utilizing the original value of the contracts, as if completed, even though Grapevine did not complete all the work required. As the party committing the first material breach, discharging YC of further obligation under the

subcontracts, it cannot now gain the full benefit of that agreement. *See, e.g.*, *Bartush-Schnitzius Foods Co.*, 518 S.W.3d at 436 (recognizing if "one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance"). Instead, its breach allowed YC to walk away from that contract recovering from Grapevine the cost it incurred to complete the projects with another contractor.

While both parties agree that the trial court calculated the offset using the total value of the contracts and both agree that the offset should be calculated, instead, as the amount owed by YC to Grapevine for work performed,[24] they disagree as to the value of that unpaid work, reflecting the dispute over the quality and extent of completion set forth in the invoices. While we agree with Grapevine that there is sufficient evidence to support a damages award for work performed but left unpaid, we cannot affirm the damage award as made by the trial court for the reasons set forth above.

Ordinarily, when reversing a trial court's judgment, we must render the judgment the trial court should have rendered unless remand is necessary for further proceedings or in the interest of justice. *See* TEX. R. APP. P. 43.3. But, here, that would require us to step into the role of the factfinder to determine whether YC or Grapevine is correct as to the amount of damages to which Grapevine is entitled, something we cannot do. *See Akin, Gump*, 299 S.W.3d at 124 (providing if there is some evidence of damages, but not enough to support full amount, it is inappropriate to render judgment); *see, e.g.*, *Piwko*, 2024 WL 3198891, at *9 (same). Thus, a new factfinder must determine the amount of work performed by Grapevine but left unpaid. But, we cannot simply remand the issue of damages when liability is contested, leaving us with the only option being to remand for a new trial. *See* TEX. R. APP. P. 44.1(b); *Villarreal v. Timms*, 623 S.W.3d 386, 391

---

[24] Grapevine points to its Amended Original Petition which asserted that YC breached the subcontracts by failing to pay Grapevine amounts owed for work performed.

(Tex. App.—San Antonio 2019, no pet.) ("An appellate court may not reverse and remand for a new trial on damages alone when, as here, liability was contested in the trial court.").

Even more unfortunate is the fact that this error impacts, not just YC's liability for breach of contract and the damages owed to Grapevine, but the trial court's judgment in its entirety. Because the trial court did not enter a judgment that made separate awards of damages to YC and damages to Grapevine, but instead calculated an offset and awarded the sum remainder to YC, by setting aside part of that calculation we must set aside the whole—as there is no separate award to YC that we can affirm. *Accord* TEX. R. APP. P. 44.1(b) ("If the error affects part of, but not all, the matter in controversy and that part is separable without unfairness to the parties, the judgment must be reversed and a new trial ordered only as to the part affected by the error."). Thus, we must remand for a new trial as both liability and damages on Grapevine and YC's breach of contract claims. Further, because we reverse on those issues, we must also reverse and remand all awards of attorney's fees (Issue No. 9). *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 38.001; *Silberstein v. Lewis*, No. 01-17-00294-CV, 2018 WL 6684844, at *7 (Tex. App.—Houston [1st Dist.] Dec. 20, 2018, no pet.); *Strebel v. Wimberly*, 371 S.W.3d 267, 285 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).[25]

### GRAPEVINE'S QUANTUM MERUIT CLAIM

Grapevine argues the trial court erred by denying its quantum meruit claim. It points to the fact that YC accepted its performance and the amounts charged, received payment thereon from the project owners, but failed to pay Grapevine for the work performed. It contends it was therefore entitled to establish the reasonable value of the benefits conferred on the basis of quantum meruit.

---

[25] Although we reverse for a new trial on liability and damages, we addressed and found legally sufficient evidence supporting at least some of the damages awarded because, otherwise, we would have been called to reverse and render. *See* TEX. R. APP. P. 43.3; *See, e.g.*, *Piwko*, 2024 WL 3198891, at *1 n.1 (stating same).

Notably, "quantum-meruit is an equitable remedy based upon the promise implied by law to pay for beneficial services rendered or materials furnished and knowingly accepted." *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 741 (Tex. 2018). Recovery "will be had when nonpayment for the services rendered or materials furnished would result in an unjust enrichment to the party benefitted by the work." *Id.* However, "[a] party generally cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005); *see, e.g.*, *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990) (same).

But, Grapevine pleads in the alternative for quantum meruit recovery in the event it is not able to recover on the contract. In fact, the parties agreed it would be able to do so, stating in the subcontracts that Grapevine shall have the rights and remedies available at law or in equity for YC's breach of the subcontracts provided Grapevine gives written notice of an alleged breach or default within forty-eight (48) hours.

We note the parties have explicitly made Grapevine's right to payment under the contract conditioned on the provision of appropriate progress reports. *See e.g. Solar Applications Engineering, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (recognizing that party may be barred from receiving contract balance by failure to complete condition precedent). While taking no position on whether such a condition precedent precludes Grapevine's recovery on breach of contract in this case, we do recognize that—in the event that it does—Grapevine may be entitled to recover under the equitable theory of quantum meruit for the value of the work performed and accepted by YC. *See Hill*, 544 S.W.3d at 741. For that reason, we reverse the trial court's ruling as to quantum meruit and remand it along with the breach of contract claims, to be determined in the alternative.

**GRAPEVINE'S TEXAS PROPERTY CODE CLAIMS**

Grapevine also raises a series of errors related to the trial court's application of the Texas Property Code. Specifically, it contends the trial court erred in denying Grapevine's claims under the Construction Trust Fund Act, the Texas Prompt Payment Act, and its claims relating to its mechanic's liens against the project owners and the indemnity bond surety.

**Texas Construction Trust Fund Act Claim**

First, Grapevine argues the trial court erred when it concluded Grapevine was not permitted to recover under the Construction Trust Fund Act. TEX. PROP. CODE §§ 162.001–.033. Grapevine argues that as soon as the project owners paid YC, YC became the trustee and Grapevine the beneficiary of those funds and that YC breached its duty as trustee when it failed to pay those funds to Grapevine. TEX. PROP. CODE §§ 162.001–.002. The trial court concluded that Grapevine could not recover under the Trust Fund Act because YC had an affirmative defense, finding that YC did not misapply the funds. *See* TEX. PROP. CODE § 162.031(b). Specifically, the trial court found that (a) YC used the funds to pay YC's actual expenses directly related to the construction and (b) YC retained the funds, after notice to Grapevine, based on a reasonable belief that Grapevine was not entitled to payment. *See* TEX. PROP. CODE § 162.031(b).

The Construction Trust Fund Act "was enacted for the protection of laborers and materialmen, and is a remedial statute that should be given a broad construction." *Dealers Elec. Supply v. Scoggins Constr. Co.*, 292 S.W.3d 650, 658 (Tex. 2009). A trustee that "intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, . . . or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds, has misapplied the trust funds." TEX. PROP. CODE § 162.031(a); *see Dealers Elec. Supply*, 292 S.W.3d at 657. But, as noted by the trial court, a trustee has an affirmative defense if the trustee used the trust funds to pay "actual expenses directly related to the

construction or repair of the improvement or have been retained by the trustee, after notice to the beneficiary who has made a request for payment as a result of the trustee's reasonable belief that the beneficiary is not entitled to such funds." TEX. PROP. CODE § 162.031(b); *see Dealers Elec. Supply*, 292 S.W.3d at 659.

Here, as pointed out by Grapevine, YC sought payment from and was paid by the project owners using Grapevine's invoices, despite its assertion to Grapevine that the progress estimates were not correct. YC worked with Grapevine to secure revised invoices demonstrating the actual work that was completed and, as to those revised invoices agreed to pay Grapevine, going so far as to prepare a check for Grapevine in an amount to cover the October invoices for both projects. But it made the delivery of that check contingent on Grapevine's payment of the Curv invoices. Before that check was delivered, Grapevine stopped work, YC hired C4 to finish the job, and YC provided notice to Grapevine of its intent to hold the funds.

The evidence does support the trial court's findings that YC used the trust funds to pay its "actual expenses directly related to the construction or repair of the improvement," that being the costs incurred by YC to repair work performed by Grapevine and to complete the work required under the subcontracts. TEX. PROP. CODE § 162.031(b); *Dealers Elec. Supply*, 292 S.W.3d at 659. But, with regard to the check which YC cut to Grapevine but did not deliver, there is no evidence that YC had a reasonable belief that Grapevine was not entitled to those funds, as is required to prove an affirmative defense under the Texas Construction Trust Fund Act when retaining funds. TEX. PROP. CODE § 162.031(b).

Because there may be a basis for Grapevine to recover under the Texas Construction Trust Fund Act with regard to at least a portion of that amount not paid by YC, and because a new factfinder will be called upon to determine what Grapevine was owed and when, we reverse and remand for a new trial on such claim.

**Texas Prompt Payment Act Claim**

Next, the trial court concluded Grapevine was not entitled to recover under the Prompt Payment Act because Grapevine submitted payment requests that improperly included work that had not been satisfactorily performed. *See* TEX. PROP. CODE §§ 28.001-.009. The trial court recognized that a good faith dispute existed concerning the percentage of work completed and the amount owed by YC with regard to the progress reports and demands for payment. *See* TEX. PROP. CODE § 28.003(b). But, here again, Grapevine points to the fact that YC repeatedly secured payment from the project owners for Grapevine's work utilizing Grapevine's invoices as support but did not forward such payments to Grapevine.[26]

Under the Texas Prompt Payment Act, a contractor who receives payment from the owner relating to a contract to improve real property is obligated to pay, within seven days, the subcontractor "the portion of the owner's payment, including interest, if any, . . .attributable to work properly performed or materials suitably stored . . . as provided under the contract by that subcontractor, to the extent of that subcontractor's interest in the owner's payment." TEX. PROP. CODE § 28.002(b). However, "[i]f a good faith dispute exists concerning the amount owed for a payment requested or required by this chapter under a contract for construction of or improvements to real property," then "the owner, contractor, or subcontractor that is disputing its obligation to pay or the amount of payment may withhold from the payment owed *not more than 100 percent of the difference between the amount the obligee claims is due and the amount the obligor claims is due.*" *Id.* § 28.003(b) (emphasis added) "A good faith dispute includes a dispute regarding whether the work was performed in a proper manner." *Id.*

---

[26] The trial court found that the subcontracts required YC to pay Grapevine, upon receipt of payment from the owner, an amount equal to the value of Grapevine's completed work, to the extent allowed and paid by owner on account of Grapevine's work, less all previous payments and less the amount of current retainage.

Here, it is clear from the evidence that a dispute existed in many regards, both with regard to the extent to which work was performed and the quality of it. But, beyond that, the trial court relied on the fact that the subcontracts provided for a condition precedent to YC's payment obligation—that being properly prepared progress reports. Even YC admitted, though, that some amount was due to Grapevine, even going so far as to cut a check for the October invoices. Because there was a dispute as to whether payment was due under the contract and, if so, how much was due, YC contends its payment obligation under the contract was not triggered. *See* TEX. PROP. CODE § 28.003(b) (referring to "the amount owed for a payment requested or *required. . .under a contract for construction* of or improvements to real property" (emphasis added)).

But, given we are remanding this case for a new trial, a new factfinder will determine what Grapevine was owed and when.[27] Thus, we remand for redetermination of YC's liability under the Texas Prompt Payment Act.

**Grapevine's Mechanic's Lien Claims**

For the same reason, because a new factfinder will determine whether Grapevine completed the work for which it sought the protection of a mechanic's lien, we also reverse the trial court's judgment in relation to Grapevine's claims under the Texas mechanic's lien statute pursuant to Texas Property Code § 53.001 for personal liability of the project owners and against the indemnity bond surety.[28]

---

[27] In the event payment was owed under the contract, the good faith dispute provision of the Texas Prompt Payment Act would only allow the withholding of the difference between what each party claims was due at the time. TEX. PROP. CODE § 28.003(b). It should also be noted, however, that "while section 28.003 allows a party to withhold prompt payment in the event of a good faith dispute, it does not exempt this withheld amount from accruing interest if the withholding party is ultimately found to be at fault for the breach." *Landmark Org., LP. v. Dephini Constr. Co.,* No. 13–04–00371–CV, 2005 WL 2560022, at *5 (Tex. App.—Corpus Christi Oct. 13, 2005, pet. denied) (mem. op.); *see also Patel v. Creation Const., Inc.*, No. 05-11-00759-CV, 2013 WL 1277874, at *4 (Tex. App.—Dallas Feb. 27, 2013, no pet.) (mem. op.) (same, applying *Landmark*).

[28] YC argues Grapevine waived all claims against the property owners and insurance surety by not appealing the trial court's judgment against the owners or the surety. Specifically, it points to the fact that Grapevine does not mention

**CONCLUSION**[29]

Despite our strong desire to end a dispute where we can, particularly an aged and complex one such as this, we must reverse and remand the matter for a new trial on all issues.

Lori Massey Brissette, Justice

---

the owners in the notice of appeal, and it does not mention the owners or the surety in its docketing statement. We reject YC's contention. As an initial matter, the notice of appeal specifically mentions the surety. And as to the owners, Rule 25.1(b) plainly provides "[t]he filing of a notice of appeal by any party invokes the appellate court's jurisdiction over all parties to the trial court's judgment or order appealed from." TEX. R. APP. P. 25.1(b). The owners and the surety are parties to the judgment, and they are adverse to Grapevine; thus, they are, by definition, appellees. *See* TEX. R. APP. P. 3.1(c); *Enzo Investments, LP v. White*, 468 S.W.3d 635, 642, n.3 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). In any event, YC asks us to treat the brief filed by it as the brief on behalf of the surety and the owners in the event we conclude Grapevine had not waived its claims against them. We treat the brief accordingly.

[29] We reject YC's contention that the trial court improperly excluded certain criminal history evidence because YC fails to provide a clear and concise argument for its contentions as to why the trial court erred or otherwise provide citations to authorities supporting such an argument. *See* TEX. R. APP. P. 38.1(i). Even if we considered it, we could not conclude the trial court abused its discretion by denying the admission of the evidence related to a thirty-year old crime in connection with insurance invoices not involving Grapevine. *See* TEX. R. EVID. 404(b); *McKee v. McNeir*, 151 S.W.3d 268, 270 (Tex. App.—Amarillo 2004, no pet.).